hKOSTELKA, Judge.
The mother (“MK”) appeals the judgment terminating her parental rights to three of her five minor daughters.[1] We affirm.
Facts
On January 19, 1996, the Ouachita Parish Office of Community Services (“OCS”) *557 received a report[2] of the sexual abuse of the three oldest of MK’s minor female children (LK, FK, AK) in December of 1995. Thereafter, OCS investigated the allegations and confirmed that the purported biological father of one of the girls molested the three girls, including his own alleged child.[3] When, on February 5, 1996, an OCS worker learned that MK had also locked three of the children alone in her home, an Instanter Order placing all of the children in the temporary custody of the State of Louisiana was issued on February 13, 1996. The five girls were placed and have remained in foster homes since that time.
Earlier reports of lack of supervision by MK of the two oldest girls in 1989 and sexual abuse of four-year-old LK in 1991 had precipitated a previous investigation of MK by OCS but no removal of the children from the home. From the time of the initial investigation of MK until trial, she exhibited a pattern of entering into short-term relationships with men. Indeed, none of the five men who MK formally named as possible fathers of the girls were proven to be the biological fathers of the children. Moreover, [ ¿trial testimony indicated that MK named fifteen men as potential fathers of the girls.
On April 16, 1996, the children were adjudicated in need of care and continued in state custody with a long-term goal of reunification by January of 1997. In furtherance of that goal, OCS set up a case plan which required that MK receive psychological evaluation and counseling, HIV testing, safe-sex education, family planning and parenting skills, continued education, provide the names of all possible fathers of the children and attend visitation schedules. Nevertheless, because of MK’s inability to protect and supervise the children as well as her lack of overall improvement, OCS changed that goal to termination in December of 1996. Thereafter, on June 30, 1997 and August 31, 1998, OCS petitioned to terminate MK’s parental rights to all five of her daughters pursuant to La. Ch.C. art. 1015(5), and the best interests of the children.
After hearing testimony and arguments on November 11, 1999, December 17, 21, 1999, and March 24, 2000, the trial court terminated MK’s rights to the three youngest of her daughters, AK, DK and BK.[4] A written judgment reflecting this determination, however, was not signed until October 9, 2000. This appeal ensued.
Discussion

Termination of Parental Rights

The state’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the state seeks the permanent severance of that relationship in an involuntary ^termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for *558 the child. State ex rel. S.M.W., 2000-3277 (La.02/21/01), 781 So.2d 1223. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the state remains to secure the best interest for the child, including the termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the state can take against its citizens. Id.
Title X of the Children’s Code governs the involuntary termination of parental rights. As applicable to this case, the grounds for termination of parental rights are found in La. Ch.C. art. 1015(5) which provides:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and. his need for a safe, stable, and permanent home.
LThe state is required to prove the elements of one of the enumerated grounds set forth in La. Ch.C. art. 1015 by clear and convincing evidence to sever the parental bond. La. Ch.C. art. 1035(A); State ex rel. S.M.W., supra. The state must only establish one statutory ground for termination, but the trial judge must also find that termination is in the best interest of the child. La. Ch.C. art. 1039; State ex rel. S.M.W., supra.
An appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest abuse of discretion or unless those findings are clearly wrong. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court which is in the unique position to see and hear the witnesses as they testify. State ex rel. S.M.W., supra.
Lack of parental compliance with a case plan may be evidenced by the parent’s lack of substantial improvement in redressing the problems preventing reunification. La. Ch.C. art. 1036(C)(6). Moreover, lack of any reasonable expectation of significant improvement in MK’s conduct may be evidenced by any physical or mental illness or mental deficiency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or an established pattern of behavior. La. Ch.C. art. 1036(D)(1).
|Jn this case, the evidence is clear, and MK does not dispute that a period of one year has elapsed since the children were removed from the custody of their mother. Nevertheless, MK contests the trial court’s determination that the state proved by clear and convincing evidence that she did not substantially comply with the court-approved case plan, that there is no reasonable expectation of significant improve *559 ment in her condition in the near future and that termination of MK’s parental rights is in the best interest of the children. After reviewing this evidence under the manifest error of review standard, however, we decline to disturb the trial court’s termination of MK’s parental rights.

Evidence

OCS investigator, Robin Rosalis, testified that as early as 1989, OCS confirmed reports of lack of supervision by MK. At that time, the two oldest children were observed unsupervised, wandering on the street looking for their mother who had not come home. When MK learned that she was being investigated by OCS, she moved out of the home where she was staying and into a home in Jonesboro, Louisiana. Because the individual with whom MK resided assured OCS that she would insure the children’s supervision, no further referral for family services was made at that time.
Laurie Traweek (“Traweek”), a foster care OCS worker, testified that in 1991 she received a report of the sexual abuse of LK by MK’s then boyfriend.[5] Traweek revealed that at the time of her involvement with the | ricase, MK moved three or four times in two months and was uncooperative in OCS’s attempts to obtain housing for her.
Dorothy Tucker (“Tucker”), a social services specialist III, confirmed MK’s pattern of moving, e.g., three times in one month. At that time, Tucker met with MK three times and advised her not to leave the children alone and that she would be referred for training in parenting skills.
Tucker was again assigned to MK’s case in 1996 when OCS investigated the abuse allegations, but prior to the children’s removal from the home. She participated in hands-on, home-base services which included almost daily home visits and intense supervision in an effort to insure the safety of the children. Tucker testified that although MK was receptive to her suggestions regarding parenting skills, she failed to carry out the things which she was told to do. Examples included MK’s continued lack of supervision of the children and failure to give the children necessary medication. Due to Tucker’s belief that MK was not keeping the children safe, she made the recommendation that the children be removed from the home. Tucker admitted that MK’s children were average students and that MK generally kept a clean home. Although the relationship was loving, Tucker observed that the children told MK what to do.
Cassandra Brown, a social services specialist III, investigated and confirmed the 1996 abuse allegations. Although she informed MK that the children should not have contact with the perpetrator, MK did not follow her advice and allowed him to visit.
Michelle Poe Triplett (“Triplett”), a licensed social worker qualified as an expert in social work, met MK and four of the girls in a therapeutic |7setting. Triplett testified that although the children responded optimally to therapy, MK made no progress in learning to protect the girls. Although she tried, MK not only failed to grasp essential developmental issues regarding her children, but did not understand how to enhance or improve those areas. Triplett did not feel that MK could be helped any further and terminated therapy after seven months. She felt that, because MK possessed inadequate judg *560 ment and insight necessary for parenting, her long-term ability to provide a safe, stable and adequate home for the children would be extremely difficult. Although she, too, acknowledged a loving bond between the mother and children, Triplett opined that it would be very difficult for MK to keep the girls protected without live-in help.
Bernadette Huey (“Huey”), the parish manager for the Union Parish OCS, assisted in supervising the family visits after the children were removed from the home and was also FK’s caseworker. She observed that during the visits, MK appeared childlike and described her as a playmate rather than a parent. Huey felt that MK was unable to set limits or discipline the children. Although Huey made parenting recommendations to MK and MK acknowledged the suggestions, she could not carry them out. Huey noted MK’s frustration with the children on one visit simply because they were asking questions. Huey testified that MK made all of her visits until the summer of 1999 when OCS did not know her whereabouts and she was hospitalized in a psychiatric unit.
Dr. Sally Thigpen (“Dr. Thigpen”), an expert in counseling, marriage and family therapy, testified that her evaluations of MK 'resulted in two written reports based on examinations conducted March 19-21, 1997 and | sSeptember 3, 1998.[6] Dr. Thig-pen’s report indicated that at the age of two, MK was hit by a car which caused permanent brain injury. Resultantly, tests demonstrated that MK performed at the mildly mentally retarded level (composite Intelligence Quotient of 57) and had problems with cognitive abilities and adapting skills. Dr. Thigpen’s initial report expressed that “[MK] lacks the intellectual resources to independently rear children in a safe environment” and concluded that “it is unlikely that [MK] can make the major changes in her life which would be necessary for her to provide for her children a safe, stable environment.”
The September 3, 1998 report revealed a decline in MK’s adaptive functioning or behavior which included her ability to care for herself. At trial, Dr. Thigpen related a possible cause for the decline as MK’s hospitalization for psychiatric problems in 1999. Notably, the second report described as a serious problem MK’s , “continued behavior of inviting men to live with her .... ” which indicated “that her impulses supersede her rational thought rather easily.”
During trial, Dr. Thigpen explained that MK’s Global Assessment of Functioning Scale, an evaluation of how well a person functions in general, indicated psychiatric problems. At this functioning level, Dr. Thigpen opined that it was doubtful that MK could learn the requirements of parenting. After her evaluations and testing of MK, Dr. Thigpen concluded that there existed no reasonable expectation of change and that MK was not capable of exercising parental responsibility without exposing the children 19to substantial risk of serious harm. She felt that MK was not able to handle the judgment calls required of parents, did not understand the ramifications of leaving the children alone and was not capable of following the rules needed for conditioning the children. Dr. Thigpen expressed concern over MK’s inordinate desire to be married and the continual short-term relationships with men which resulted. She concluded that although there existed no danger of MK abusing the children, she was concerned that MK would make bad decisions which would endanger them.
*561 Stephanie Wright (“Wright”), an OCS caseworker assigned to the case from February 13, 1996 to the time of trial, detailed her experiences with MK and her family. She assisted in setting up a case plan for MK with which she generally complied to the best of her ability. Nevertheless, Wright had concerns with MK’s parenting skills. Despite MK’s parenting class attendance and verbalization of what she learned, Wright testified that she was unable to demonstrate what she had learned. Wright concluded that MK’s ability to parent is minimal and she showed no improvement from the time of the first class to her completion. Wright noted that at MK’s supervised visits with the children, she exhibited inappropriate behavior that included her being overwhelmed with the children at times. Wright remained concerned about MK’s pattern of impulsiveness in relationships precipitated by her inordinate desire for a mate. She felt that MK had not changed this type of behavior which had been consistent prior to agency involvement and up until the time of trial. Consistent with that conclusion was Wright’s testimony that in 1999, MK and her new fiancé moved into a two-three bedroom duplex but MK did not remain there. At the time of Imtrial, MK resided with her father who wae unable to care for the children. In fact, she knew that MK had named fifteen men as potential fathers of the girls. Wright opined that this continued pattern created an enduring hazard for further abuse of the children. Until spring of 1999, MK was consistent with visitation but traveled to Chicago and was hospitalized while there. In the six months prior to trial, Wright observed a decline in MK’s mental state that included several hospitalizations for depression and psychosis with hallucinations. Wright felt that although MK loved the children, she demonstrated no change in her inability to care for them.
Wright explained that each of the daughters have adjusted very well to their respective foster homes where they had resided for almost four years. Wright revealed that the foster parents desired to adopt the girls which she felt was the best option for the children.

Lack of Compliance With Case Plan

The record shows that it was MK’s inadequate parenting skills, including the lack of judgment relating to supervision of her children and her pattern of copious short-term and obviously unwise relationship choices, which precipitated the removal of her children from their home after three of the children were sexually abused. However, it is equally apparent that MK’s pattern of behavior cannot be isolated to the events which resulted in the present proceedings and relate back to the sexual molestation of her oldest child by one of MK’s numerous boyfriends and other instances of inadequate supervision. While it is true that MK did not commit the egregious incidents of sexual abuse, both the expert and caseworker testimony presented by the state pinpointed as a serious part of |nthe problem MK’s poor judgment and insight both in decision-making regarding the children as well as her choices of male companionship. Indeed, regarding MK’s relationship patterns and inordinate desire for marriage, Dr. Thigpen felt that she was and would continue to be impulsively rather than rationally driven. Moreover, despite attempts at reforming MK in these areas, both expert and caseworker testimony presented at trial likewise demonstrated that MK continued her patterns with men until the time of trial, even once allowing the perpetrator of the sexual abuse into her home after warnings against doing so. Additionally, MK failed to respond to instruction on correcting her parenting and judgment inadequacies and simply could *562 not put into practice the things she had learned. In fact, at the time of the second, more expansive testing by Dr. Thigpen, MK demonstrated a decline in her adaptive behavior or ability to take care of herself. In her second evaluation of MK, Dr. Thigpen noted “nothing that would suggest that [MK] is better able to parent her children than she was a year ago.” Ultimately, the testimony showed that MK failed to improve her ability to nurture or protect the children and had, in the opinion of both the experts and caseworkers, reached her maximum parenting potential. Of course, the law has long been that the reformation of a parent, for purposes of determining whether to terminate parental rights, means more than mere cooperation with agency authorities. A showing of a significant, substantial indication of reformation is required, such as altering or modifying in a significant way the behavior which served as the basis for the removal. State in Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445; State in Interest of TD v. Webb, 28,471 (La.App.2d Cir.05/08/96), 674 So.2d 1077. Moreover, a parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated, even when the parent is mentally ill or impaired. State in Interest of D.T. v. K.T., 29,796 (La.App.2d Cir.06/18/97), 697 So.2d 665. Under the circumstances before us, we cannot conclude that MK has demonstrated substantial improvement in the problems which prevent unification. Accordingly, the evidence clearly supports the trial court determination that MK failed to substantially comply with the department’s case plan.

Reasonable Expectation of Significant Improvement

So does the expert evidence support the lower court’s determination that MK’s mental state renders her incapable of exercising parental responsibilities without exposing the children to a substantial risk of harm under La. Ch.C. art. 1015(5) and 1036(D)(1). Of course, mental illness, standing alone, is insufficient grounds to warrant termination of the parent’s rights. Instead the mental deficiency must be related to parenting ability. State ex. rel. S.M.W., supra.
In the case sub judice, both Triplett and Dr. Thigpen expressed serious concern regarding MK’s ability to parent due to her mental disabilities. Most compelling was Dr. Thigpen’s conclusion that MK’s intellectual resources severely limited her ability to parent to the point that she would be unable to rear the children in a safe environment. Dr. Thigpen stressed that MK’s simplistic hopes regarding marriage motivated her impulsive behavior and caused her to be vulnerable to abusive relationships. Dr. Thigpen also noted that MK’s sense of powerlessness and tendency to | ^constrict herself when faced with stress made it likely that she would be inactive in protecting her children. Dr. Thigpen concluded that there existed no reasonable expectation of change in MK’s parenting abilities and that she was incapable of exercising her parental skills without exposing the children to a substantial risk of serious harm. Specifically, she felt that MK’s pattern of bad decision-making would endanger the children. Clearly, too, the caseworker testimony revealed MK’s established and continued pattern of unwise relationship decisions which spanned a period of over five years and ultimately resulted in egregious harm to the girls.
Even after her best efforts in counseling and parenting assistance, and with the knowledge that her children might be taken from her, MK failed to substantially improve her parenting skills and continued relationships with men in a manner that *563 had historically proven dangerous to her children. In our opinion, these facts support the expert and caseworker conclusion that MK has reached her potential parenting capabilities and is unable to utilize those skills without exposing the children to serious harm. Accordingly, we affirm the trial court’s conclusion that there existed no reasonable expectation of significant improvement in MK’s conduct.

Best Interest of the Children

Ultimately, the trial court found termination to be in the best interest of MK’s daughters, both based upon the above-discussed conclusions and the length of time the children have been in the custody of the state and their need for a stable home. Indeed, at the time of this opinion these children have been in custody of the state for over five and one-half years. A best-interest evaluation would be incomplete without taking this fact into consideration. See, State ex rel. S.M., 99-0526 (La.App. 4th Cir.04/28/99), 733 So.2d 159, writ denied, 99-2127 (La.07/21/99), 747 So.2d 36; State in the Interest of C.D., 558 So.2d 806 (La.App. 5th Cir.1990). As such, we agree that the issue of stability is relevant to the ultimate best-interest determination. We do not doubt that MK and her children love one another. However, a parent’s love and provision of a house is not enough when that parent is unable or unwilling to provide adequate care for his or her children’s physical, emotional, and mental health needs. State ex rel. S.M.W., supra. We recognize that MK is not responsible for her mental condition. Unfortunately, however, neither the bond between MK and her children nor MK’s attempts, without resulting significant changes in both her parenting skills and lifestyle, are sufficient to override the primary concern of the children’s interest in having a stable, safe and permanent home in this instance. Accordingly, our careful investigation of the record before us supports the trial court determination that the best interests of AK, DK and BK are best served by the termination of MK’s parental rights.

Children’s Claims

We note that the attorney for the children, who stand in the posture of appellees for purposes of this appeal, has sought to contest the trial court’s denial of a request that an expert evaluate the bond between the mother and the children and to determine whether the termination of the mother’s rights would be more traumatic to the children than long-term foster care. Nevertheless, because appellees have failed to answer the appeal, they are precluded from seeking modification, revision or reversal of the trial court judgment. La. C.C.P. art. 2133; Maumus v. Leblanc, 98-2422 (La.App. 4th Cir.05/19/99), 733 So.2d 1268.
CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. In chronological order, MK's daughters include LK, FK, AK, DK and BK. Unless specified, references in this appeal are to AK, DK and BK only.

.MK reported the abuse to police in January of 1996. The perpetrator was prosecuted and received a life sentence for the offenses and stipulated to the termination of his parental rights as to any of MK's daughters on December 13, 1999.

. Medical examinations of the girls confirmed sexual molestation and that two of the girls suffered from sexually-transmitted diseases.

. LK and FK were continued in long-term foster care.

. The perpetrator, the brother of the woman with whom MK resided, was convicted of carnal knowledge of a juvenile, partly arising from the offense.

. Because the case plan indicates that MK was to complete parenting classes by July of 1996, it is apparent that Thigpen's conclusions were made after MK’s parenting training.