EZELL, Judge.
_|jln this matter, the State of Louisiana appeals the decision of the trial court de *737 nying its petition to terminate the parental rights of the mother, M.J.A., toward her three minor children, J.P.A, N.J.A., and B.L.A. For the following reasons, we reverse the decision of the trial court and render judgment terminating M.J.A.’s parental rights.
J.P.A. and N.J.A. are the illegitimate children of M.J.A. and J.A T. B.L.A. is the legitimate child of M.J.A. and F.A. However, all three children lived with M.J.A. and F.A. In March of 1999, the State, through the Office of Community Services investigated a claim that the minors J.P.A., N.J.A., and B.L.A. were without adequate food and shelter. The claims were validated and the family was placed on agency supervision. In September of 1999, OCS learned that Francis Thibodeaux, a known pedophile, was a friend of M.J.A.’s and was spending time around the children. At this time, OCS caseworkers warned M.J.A. to not allow Thibodeaux around the children. On February 9, 2000, the children were adjudicated children in need of care, but were not removed from the home. At that time, the trial court also ordered M.J.A. to disallow contact between Thibo-deaux and her children. The family was released from agency supervision in January 2001.
After a report that Francis Thibodeaux had molested N.J.A. on several occasions, J.P.A., N.J.A., and B.L.A. were removed from the custody of their parents on June 17, 2002. On July 24, 2002, the children were again adjudicated children in need of care. A case plan for reunification was established for the family and approved by the trial court. In December 2003, the permanent plan for the children was changed to adoption. In January of 2004, the State filed a petition to terminate the parental rights and to certify the children for adoption. The trial court terminated |athe parental rights of the fathers, but not as to M.J.A. From that decision, the State appeals, seeking the termination of M. J.A.’s parental rights as well.
As noted by the supreme court in State ex rel. SNW v. Mitchell, 01-2128, pp. 8-10 (La.11/28/01), 800 So.2d 809, 814-16 (alterations in original)(footnote omitted):
A well-settled principle is that the “the [sic] fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982). Reiterating this principle, the Supreme Court recently remarked that this liberty interest is “perhaps the oldest of the fundamental liberty interests.” Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000). A corollary principle is that in an involuntarily termination of parental rights proceeding, a court must delicately balance the natural parent’s fundamental right and the child’s right to a permanent home.
In 1997, Congress passed the Adoption and Safe Families Act (ASFA), 42 U.S.C. § 601, et seq. The ASFA tilts this delicate balance in the child’s favor and requires states, as a condition to continued receipt of certain federal funding, to enact parallel legislation. Simply stated, ASFA is intended to make four principal reforms; to wit:
[1] that the safety of children is paramount in custody decision making; [2] that foster care is temporary and that agency and judicial decision making must be expedited in order to optimize the child’s needs for a stable and permanent home; [3] that the state’s duty to make “reasonable efforts” to reunify a family is subordinate to legitimate concerns about *738 the child’s health and safety; and [4] that states will be held accountable for their efforts to reduce the number of children who are stranded in the foster care system.
La. Ch.C. art. 601, Official Cmt. (b)(emphasis supplied).
Complying with the ASFA, the Louisiana Legislature amended several of the termination provisions including La. Ch.C. art. 601, which was amended to declare that “[t]he health, safety, and best interest of the child shall be the paramount concern in all proceedings under this Title.” See La. Ch.C. art. 601, Official Cmt. (c) (noting that “the child’s health and safety is the paramount concern in determining what is reasonable and consistent with the department’s plan for timely, permanent placement of a child.”). Under certain egregious circumstances (not present here), the state is entirely excused by La. Ch.C. art. 672.1 from making any reasonable efforts to reunify.
IsThat the balance is tilted in the child’s favor is further evidenced by La. Ch.C. art. 702 E, which provides:
Except as otherwise provided in La. Ch.C. art. 672.1 [which excuses the state in certain cases from exercising reasonable efforts], the court shall determine whether the department has made reasonable efforts to reunify the parent and child.... The child’s health and safety shall be the paramount concern in the court’s determination of the permanent plan.
And, La. Ch.C. art. 702 D(l) places the burden on the parent seeking to avoid termination when the child has been in foster care for over twelve months; particularly, it provides:
In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress towards achieving its goals and correcting the conditions requiring the child to be in care. (Emphasis supplied).
Consistent with this federally-prompted shift in policy, our recent decisions have recognized that “the primary concern of the courts and the state remains to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven.” State in the Interest of S.M.W., C.D.W., C.N.W. and E.S.W., 00-3277 at p. 21 (La.2/21/01), 781 So.2d 1223, 1238.
Seven statutory grounds for involuntary termination of parental rights are set forth in La. Ch.C. art. 1015. Only one ground need be established; however, the trial judge must also find that termination is in the child’s best interest. La. Ch.C. arts. 1015,1039; State in the Interest of ML and PL, 95-0045 at p. 4 (La.9/5/95), 660 So.2d 830, 832. Given the draconian nature of an involuntary termination proceeding, the state is required to prove the statutory ground on which it relies by clear and convincing evidence. La. Ch.C. art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)(hold-ing clear and convincing to be minimum standard of proof in termination cases). A trial judge’s findings on factually-intense termination issues are governed by the manifest error standard of review. State in the Interest of S.M.W., 00-3277 at p. 14, 781 So.2d at 1233.
With that general policy background in mind, we turn to the specific facts of this case. Among the grounds alleged for termination of M.J.A.’s rights was La.Ch. Code art. 1015(5), which states:
LUnless sooner permitted by the court, at least one year has elapsed since *739 a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
Louisiana Children’s Code Article 1036 states in pertinent part:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
[[Image here]]
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the
parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3)Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
Based on the record before us, we find that the trial court committed manifest error by not terminating the parental rights of M.J.A., as the State has proven by clear |fiand convincing evidence that M.J.A. has not substantially complied with her case plan in the almost three years between the time her children were placed in foster care and the time of the trial. For the following reasons, we also find that there is no evidence of any reasonable expectation of improvement on M.J.A.’s part in the near future.
The court-approved case plan developed for M.J.A. remained essentially the same throughout these proceedings. The requirements were essentially that M.J.A. was to maintain adequate housing, maintain sufficient income, attend parenting classes, and complete psychological evaluations.
M.J.A. and her husband failed to maintain a stable home. They moved frequently and were even evicted due to non-payment of rent. Most of the time, one or more of the necessary utilities, such as electricity, water, or gas were shut off due to non-payment. The trial court even noted during the trial that M.J.A. and her husband were unable to sustain these needs without the costs associated with raising three children and openly wondered how they would do so should the children be returned.
*740 The failure to meet this portion of the case plan is directly connected with their failure to meet another part of the plan, maintaining sufficient income. M.J.A. would sporadically cut lawns, sometimes making $20 a week. Her husband would make around $100 a week, but spent most of the money sustaining his crack cocaine addiction.
While M.J.A. did attend parenting classes, and apparently did quite well in the classes themselves, she failed to show any benefit from them when around her children during visits. Even after her best efforts in counseling and parenting assistance, and with the knowledge that her children might be taken from her, M.J.A. | Jailed to substantially improve her parenting skills. During visits with the children she threatened suicide, threatened physical violence toward caseworkers, and repeatedly told the children inappropriate things, such as OCS needed to let them come home so they could do as they pleased, or even that she didn’t care if the children came home. Dr. Eckholdt, the second psychologist to evaluate M.J.A., testified that her belligerent behavior towards caseworkers and the foster parents housing her children was sabotaging the children’s care. After visits, the children were often emotional wrecks, sometimes taking days to calm down, and often suffering from relapses of increased bladder or bowel accidents. It is clear from the record that M.J.A. failed to substantially comply with her case plan.
The trial court found there to be a reasonable expectation of significant improvement in the near future. Again, we disagree. The trial court notes in its reasons for judgment that the State had, at one point in 2001, decided to terminate supervision of the family. It goes on to state that the “only fact that is now different is that there was a sexual abuse scene by a third person who is no longer in contact with [N.J.A.].” We find the fact that Francis Thibodeaux is now incarcerated to be irrelevant to the matter at hand. It does not remedy the fact that he was allowed near the family in the first place. Nor do we look so dismissively upon the fact that N.J.A. was molested.
M.J.A. knew Thibodeaux was a pedophile, from others and by his own admission. In fact, the trial court in its reasons for judgment notes that it warned M.J.A. about Thibodeaux, and that she violated a court order by allowing him near the children. Still, she allowed Thibodeaux to not only stay overnight at her home routinely, but also to be alone with the children. Simply put, M.J.A.’s unbelievably poor judgment placed her children in inevitable danger. Furthermore, she has shown | ^little to no understanding or responsibility for her actions which led directly to N.J.A.’s molestation. Instead, her response was anger toward her own mother for reporting the molestation to the police, an action she blames for her children being removed from her home, and which she told case workers cost her her sole mode of transportation, namely Thibodeaux. And rather than feeling sympathy or empathy toward her daughter after the molestation, M.J.A. became angry with the child for going to her grandmother rather than her. According to the testimony of Dr. Eckholdt, this reaction only places N.J.A. at risk for further trauma.
M.J.A.’s continued relationship with a crack addict is further evidence of her extremely poor judgment. And, contrary to the views expressed by the trial court, there is nothing in the record whatsoever which indicates she can or would choose her children over her husband. Rather, the record shows her repeated decision to stay with him despite the environment his addiction has created for her children. *741 This continued profoundly poor judgment indicates that there is no reason to believe she could protect her children from further harm. Furthermore, the record establishes that M.J.A. is only marginally capable of handling her own affairs due to her mental limitations. We find that she is incapable of handling the raising of the children along with her husband. Should she leave him as the trial court suggests, this would only compound her problems with housing and income, making it even harder for her to be able to raise the children.
Also in its reasons for judgment, the trial court notes that Dr. Buxton suggests reunification with long-term supervision. However, Dr. Buxton’s own testimony indicates that he interviewed the family only once, at the time the children were removed from the family home. He testified that once his evaluations were complete, he was no longer in the best position to determine what, if any, progress had been [¿made in line with the case plan. Rather, the record shows (and Dr. Buxton’s testimony supports) that the caseworkers who regularly saw M.J.A. and the children were in a much better position to determine the progress made with the case plan. These caseworkers clearly thought that little to no progress had been made towards reunification. Accordingly, we find that the trial court’s reliance on Dr. Buxton’s initial opinion as a reason not to terminate to be misplaced.
Finally, the trial court states that due to M.J.A.’s cognitive limitation, the timetables for reunification should be stretched. We find this to be error. Mental illness or deficiencies, standing alone, are insufficient grounds to warrant termination of the parent’s rights. See State ex rel. L.C.K. v. M.E.K., 35,416 (La.App. 2 Cir. 9/26/01), 799 So.2d 555. However, the mental deficiency related to parenting ability can lead to termination of parental rights. Id. In the case sub judice, Dr. Eckholdt expressed serious concern regarding M.J.A.’s ability to parent due to her mental disabilities. The stretching of the timetables to allow M.J.A. more time to prove her ability as a parent is indicative of the trial court’s decision to place her interests over those of her children. The timetables set up for termination are established for the benefit of the children, whose interests are paramount and must be maintained, even at the expense of the rights or desires of M. J.A. ■
The trial court below was clearly moved by M.J.A.’s love for her children. This fact is hard, if not impossible, to ignore. There is no doubt among any who testified in this case as to this love. However, the uncontradicted testimony is that, while she may love them deeply, she does not possess the ability or the judgment to maintain an appropriate, supportive environment for these children. That while she has the desire to be a parent to them, she does not possess the necessary ability. It is apparent from the trial court’s reasons for judgment that it placed M.J.A.’s love |9for her children over the best interests of the children themselves. While this is easy to do in light of her love for them, it is not the feelings or desires of the mother that we must consider. The best interests of the children alone is paramount. The record indicates that the best interests of these children lay in the termination of M.J.A.’s parental rights and the placement of these children for adoption. Accordingly, that is what we must, unfortunately, do.
The decision of the trial court is hereby reversed, and we render judgment, terminating the parental rights of M.J.A. All court costs on appeal are waived.
REVERSED AND RENDERED.
COOKS, J., concurs in the result.
*742 GENOVESE, J., dissents and assigns written reasons.
PETERS, J., dissents for the reasons assigned by Judge GENOVESE.