# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1598

**STATE OF LOUISIANA**

**IN THE INTEREST OF**

**M. M.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2002-0596
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## J. DAVID PAINTER
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and J. David Painter, Judges.

AFFIRMED.

Elizabeth A. Long
Sanford & Long
600 Jefferson St., Ste. 509
Lafayette, LA 70501
Counsel for Appellant:
    B. T.

Lloyd Dangerfield
Attorney at Law
703 E. Universty Ave.
Lafayette, LA 70503
Counsel for Appellant:
    D. M.

Allyson Edwards Prejean
Attorney at Law
115 W. Main St.
Lafayette, LA  70501
Counsel for the minor child:
    M. M.

Debra K. Basile
Attorney at Law
825 Kaliste Saloom Rd.
Brandywine I, Ste. 218
Lafayette, LA 70508
Counsel for Appellee:
    State of Louisiana,
    Department of Social Services

**PAINTER, Judge.**

The mother and father appeal the termination of their parental rights with regard to the minor child, M. M. Finding termination to be in the best interest of the child, we affirm.

FACTS AND PROCEDURAL HISTORY

On September 6, 2002, at about 3:00 p.m., B. T. brought her twenty-four month old daughter, M. M., to the emergency room for treatment of injuries to her face and head. B. T. explained the injuries to the left side of her face, saying that M. M. ran into the door while chasing the dog through the house at 2:00 a.m. B. T. further stated that, because the child was woozy and vomiting, she put the child in the bathtub to keep her awake and that, upon taking M. M. out of the tub, she slipped and hit the right side of her face. The emergency room physician suspected abuse and called the child's pediatrician. M. M.'s left eye was swollen shut and she had severe bruising on the left side of her face and bruising on the right side of her face. Her pediatrician felt the right side injury had been sustained two or three days prior to the left side injury. X-rays showed that the child had a right sided subdural hematoma. The Office of Community Services was called in, and the State took custody of M. M. pursuant to an instanter order issued that day based on allegations of physical abuse and lack of supervision. B. T. was questioned by the police and her story with regard to the injury changed. She told the police that she had been out at a nightclub on the night of September 5 until the early morning hours of September 6, leaving M. M. in the care of her live-in boyfriend, L. F. She stated that when she woke up, she discovered the injuries to the child, and L. F. told her they happened as she had described to the emergency room personnel.

1

The child was placed with her paternal grandparents, where her father, D. M., was living at the time. M. M. was adjudicated a child in need of care, and the trial court approved case plans designed to allow the father and mother to work toward reunification. The trial court reviewed the case at about six month intervals and, as of the September 2003 hearing, the State's goal changed from reunification to adoption. By the September 2004 hearing, B. T. had pled guilty to Second Degree Cruelty to a Juvenile. The court, at that hearing, reduced B. T.'s visitation to once a month. M. M. was removed from the home of her grandparents and placed with a non-related foster family after the discovery that the grandmother had a more extensive history of mental health problems than had previously been known.

In September 2004, the State filed a Petition for Termination of Parental Rights and Certification for Adoption. Testimony was taken over nine days during March, April, and May 2005. At the conclusion of the hearing, the trial court terminated the parental rights of B. T. and D. M., but ordered visitation for the paternal grandmother, S. M. B. T. and D. M. have each appealed the judgment. Both assert that the trial court erred in terminating their parental rights. Alternatively, D. M. argues that, if parental rights were correctly terminated, the paternal grandparents should have been given custody of the child. B. T. argues that when M. M. was removed from the paternal grandparents, a placement with one of her family members should have been considered.

## DISCUSSION

In *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents' interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." The

Court went on to acknowledge that, while the State has an "urgent interest" in a child's welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State's interest must favor preservation over severance of natural familial bonds. *Id.* at 766, 102 S.Ct. at 1401 (quoting *Lassiter v. Department of Soc. Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the Court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children's legal bonds are not erroneously severed from fit parents. *Id.* at 753-54, 102 S.Ct. at 1395.

. . . .

In order to terminate rights, the court must find that the State has established at least one of the statutory grounds contained in LSA-Ch.C. art. 1015 by clear and convincing evidence. *State in the Interest of J.A.,* 752 So.2d at 811. Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests. LSA-Ch.C. art. 1037(A); *State in the Interest of C.J.K. and K.K.,* 774 So.2d at 113.

*State ex rel. J. M.*, 02-2089, pp. 7-10 (La. 1/28/03), 837 So.2d 1247, 1251-53

(footnote omitted).

"Only one ground [for termination] need be established; however, the trial

judge must also find that termination is in the child's best interest." *State ex rel.*

*J. P. A.*, 05-1160, p. 3 (La.App. 3 Cir. 4/19/06), 928 So.2d 736, 738. In this case, the

petition for termination of parental rights indicated that the State sought to terminate

the rights of both B. T. and D. M. pursuant to La.Ch.Code art. 1015(5). La.Ch.Code

art. 1015(5) provides as follows:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

3

It is undisputed that over a year has passed since M. M. was removed from her parent's custody. The State contends that it has proven that neither parent has substantially complied with his or her case plan and that there is no reasonable expectation of an improvement in their conduct or conditions.

La.Ch.Code art 1036(D) sets out the means by which the State may show the lack of a reasonable expectation of improvement, as follows:

> D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

We will examine the evidence adduced in the trial court to determine whether the State carried its burden with regard to each of the parents, keeping in mind that the trial court's findings of fact with regard to termination issues are not to be overturned in the absence of manifest error. *State ex rel. J.P.A.*, 928 So.2d 736.

*Parental Rights of D. M.*

With regard to D. M., the case plan approved by the court required that he obtain stable employment and housing, attend parenting classes, obtain a substance abuse evaluation and counseling, undergo a psychological evaluation, and pay child support. Although the testimony established that D. M. complied with parts of the

4

plan, he did not obtain stable employment and housing. The testimony indicates that soon after M. M. was settled with his parents, D. M. lost interest in attempting to comply with his plan, seemingly content to cede his parental responsibilities to his mother. Although he paid rent to his parents for a time, he soon stopped. Further, he brought M. M. to visit B. T. in spite of having been instructed by his case worker that B. T. was to see the child only in State supervised settings. Dr. Bergeron, the clinical psychologist who administered the psychological evaluation, testified that while D. M.'s test results did not show alcohol dependence, they did show that D. M. was subject to periods of alcohol abuse, which would be a concern if he were the sole care giver. Dr. Bergeron further opined that the test results and consultation showed that D. M. had poor parenting skills and was not ready to be a care giver at that time. D. M. testified that he had not worked to comply with the plan because he didn't like the way the case worker spoke to him and because she wasn't nice. The trial court, in oral reasons for judgment, found that: "[D. M.] has failed to work the case plan, he's failed to pay child support, he's just failed to do kind of everything he should have done if he really wanted to keep his child." This evaluation of the evidence is not manifestly erroneous. The evidence shows that D.M. failed to comply with the court approved case plan. The State has further shown the lack of a reasonable expectation of improvement in that the evidence shows that D. M. is "unwilling to provide an adequate permanent home for the child, . . . based upon an established pattern of behavior." La.Ch.Code art. 1036(D)(3).

*Parental Rights of B. T.*

The testimony established that the court approved case plan for B. T. included requirements that she attend parenting classes and anger management classes, that she

obtain psychological counseling and cooperate with the psychologist's recommendations, maintain steady employment and housing, take responsibility for M. M. being placed in care, pay child support of fifty dollars a month, have no contact with L. F., and show that she was willing and able to protect her child from abuse.

The testimony establishes multiple failures to work toward compliance with the plan. Although B. T. did attend parenting and anger management classes, the case workers testified that she failed to apply what she had learned. She did not supply verification of employment or a copy of her lease so that the State could find out in whose name it was taken. However, B. T.'s most conspicuous failures are in connection with her failure to take responsibility for the situation, to discontinue her relationship with L. F., and her failure to show the ability and willingness to protect her child in the future.

The most striking feature of this case is the fact that it has never been established who abused M. M. B. T. has told a number of different stories, ranging from her own confession and guilty plea, to versions which implicate L. F., through versions in which she committed the abuse while drunk and/or under the influence of some unknown drug which was supposedly slipped into her drink. Under questioning by the trial judge, she testified that she did not know how the injuries to her child occurred. In light of the medical evidence that the injuries to the right and left sides of the child's face took place two or three days apart, all the stories lack credibility.

Further, although she told each of her case workers that she was having no contact with L. F., B. T. became pregnant with his child and married him. At least

6

one of her case workers testified that B. T. became angry and verbally abusive if asked about L. F.

Dr. Bergeron also evaluated B. T. With regard to her initial evaluation, he testified that her test results showed a "suppressed profile" which indicated deep seated psychological problems often associated with co-dependency. He defined co-dependency as having a lot of relationship problems. He opined that subconsciously B. T. feels that she does not deserve to have a relationship with a good man and that she tends to cope with problems in an unhealthy way, usually denial. He testified that the changing explanations of the injuries to M. M. indicate that B. T. is engaging in rationalization and trying to come up with a story that does not make her appear to be a bad person. Dr. Bergeron also stated that B. T. showed a tendency for periodic alcohol abuse. He opined that her Child Abuse Potential Inventory showed a tendency for neglect but not for abuse. Dr. Bergeron testified that when he discussed the co-dependency issue with her, she became extremely angry, and he saw the potential for explosive behavior. Dr. Bergeron again evaluated B. T. about a year later. At that time, he noted that she had completed parenting training and anger management training. He stated that her test results, at this second visit, no longer showed a suppressed profile. While he stated in his report that he would not oppose a trial reunification, he noted that the best predictor of future behavior is past behavior. He opined that B. T. requires therapy but that the therapy needed depends on whether she is the abuser or someone who is protecting the abuser at the expense of the child.

On a referral from the Office of Community Services, and after her evaluation by Dr. Bergeron, B. T. consulted four times with Dr. Staci Guidry, a psychologist.

This attempted therapy was unsuccessful according to Dr. Guidry. Dr. Guidry testified that B. T. denied any parenting deficits, any history of dysfunctional relationships, or co-dependency problems. She denied that she had abused M. M. and denied that L. F. had abused M. M. Dr. Guidry testified that B. T. became defensive when she referred to possible problems.

Dr. Kenneth Bouillion, a clinical psychologist, testified that he has treated B. T. since September 2003. He stated that her testing was within normal limits and that she did not show any personality disorders. He felt that B. T. should be reunited with her child.

With regard to B. T., the trial court gave its oral reasons for judgment, as follows:

> [B. T.'s] conduct is probably, of all the people involved, I find the most egregious. The willingness to lie, to lie repeatedly, to lie to protect probably the abuser of her child, or if - - which is probably even worse than if she had done the actual abusing. I don't know, and we'll probably never know, whether or not she did the actual abusing. I suspect she knows. But I can't prove that. If you had to say, well, I think [L. F.] probably was the one - - But she protected him, as opposed to protecting her child, which is really horrible.

In light of the record, we find that the State carried its burden of showing that, after more than two years of work with the Office of Community Services, B. T. has not substantially complied with her case plan and that there is no reasonable expectation of improvement based on her pattern of behavior. We find no error in the trial court's determination that termination of parental rights is in the best interest of the child.

8

*Placement of M. M.*

Both B. T. and D. M. argue for placement of the child with family. D. M. argues that the child should have been returned to his parents, citing La.Ch.Code 1037(B) and (D), as follows:

> B. When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. **The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.**
>
> . . . .
>
> D. A judgment terminating the parental rights of the parent shall grant custody of the child to the department, a relative who is of the age of majority and who is willing to adopt the child without an adoption subsidy, or other suitable person, in accordance with the best interest of the child.

Since M. M. was originally placed with her paternal grandparents, with apparent success, and became attached to them, D. M. argues that the court erred in not awarding custody to them. However, the trial court had sufficient evidence to support the conclusion that this would not have been in the best interest of the child. S. M., the paternal grandmother, failed to reveal the extent of her mental health problems. S. M. told the caseworkers that she had been sexually abused as a child and had received therapy for the problems resulting from that abuse. However, in the course of a home study, it was revealed that S. M. had been diagnosed with bi-polar disorder, obsessive-compulsive disorder, and post-traumatic stress disorder. It was further discovered that S. M. had not complied with treatment or medication. Additionally, S. M. began to display paranoid behavior and made inappropriate references to her own abuse and that of M. M. in front of the child. S. M. made many

9

complaints to the caseworkers about M. M.'s medical providers, which, when investigated, did not check out. Heidi Bouz, the case worker at the time M. M. was removed from the care of S. M., stated that S. M.'s problems were affecting M. M. in that S. M. was paranoid, was projecting her experiences onto M. M., and was overly protective. Case workers also stated that, before M. M. was removed from her grandparents, M. M.'s visitation with B. T. had become difficult because much of the time had to be spent comforting S. M. instead of supervising the visitation.

With regard to a placement with B. T.'s family, the testimony showed that her family members do not believe that B. T. could be responsible for the abuse to her child or that she would have allowed anyone to abuse her child.

The trial court found that the interest of the child would best be served by placing her in the custody of the State. Given the evidence with regard to the parent's families, we find no error in this determination.

## CONCLUSION

For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are to be paid one-half by B. T. and one-half by D. M.

AFFIRMED.