GARRETT, J.
*730 AP, the mother of ZP, appeals from a trial court ruling refusing to change the goal in this child in need of care ("CINC") case from adoption to reunification, changing the visitation schedule and conditions, and ordering the state to file a petition to terminate parental rights. For the following reasons, we affirm.
FACTS
As explained below, the child in this case has been in state custody for more than four years. All of the protracted court proceedings described below were heard by the same judge who, by the time of the rulings at issue here, was thoroughly familiar with the case and the procedural background.
On November 21, 2013, ZP was born to AP and DP, a married couple in their early 20s. AP, the mother, had significant mental health issues. There were concerns that she was not mentally stable enough to care for the baby and that the child might be harmed. AP had previously been diagnosed with ADHD and major depression ; she admitted to head banging or fighting. On November 25, 2013, a report of neglect/dependency was made to the Department of Children and Family Services ("DCFS"). A safety plan was developed whereby AP and ZP were to stay with AP's mother and stepfather, BP and CP. AP failed to comply with the safety plan. She did not take her mental health medications or attend her psychiatric appointments. She did not stay in the home with her parents and, due to her mental health diagnosis, she had little patience with ZP. AP was not readily available to go to ZP's medical appointments and had to be tracked down to go.
DP also had mental health issues and was largely uninterested in caring for ZP. During this time, DP lived with his grandparents. Their home was close to BP and CP. AP would frequently go there to stay with DP when she was supposed to be at her mother's house caring for ZP.
An instanter order taking ZP into state custody was issued on March 31, 2014. ZP was placed with BP and CP. A hearing was held on April 3, 2014. The DCFS worker testified that there were concerns about AP and DP, who were both approximately 21 years old. AP was not following the safety plan, which required her to stay with her parents, and was not going to medical appointments. Also, there had been an incident in which AP became upset and used profanity when talking with a DCFS supervisor on the telephone. AP and DP failed to get mental health evaluations or submit to drug testing. AP was not bonding with the baby and DP slept and played video games all day. ZP had been diagnosed with a heart murmur and was receiving care from a cardiologist.
AP testified that she had a long history of psychiatric problems and was hospitalized at Brentwood for approximately one year beginning when she was 12. Her grandmother had died and she had depression and hallucinations where she thought she saw and talked to her grandmother. She said she was bipolar, schizophrenic, and had thoughts of suicide. AP said, "I am a head banger when I get angry." While pregnant with ZP, AP banged her head harder than she meant to, and was hospitalized at Conway Hospital for several *731 days. Following the hearing, a judgment and order were signed on April 3, 2014, finding reasonable grounds to believe ZP was a CINC and custody was continued with the state.
On June 9, 2014, a CINC hearing was held. AP and DP stipulated that ZP was a CINC. A judgment to that effect was entered. AP and DP were instructed to attend mental health assessments. The trial court approved a case plan requiring AP and DP to maintain income, comply with mental health treatment, complete anger management, and complete parenting classes.
At a review hearing on September 8, 2014, the DCFS reported that AP and DP had not been working their case plans. A letter from the DCFS filed prior to the hearing stated that AP and DP were not employed and had not maintained stable incomes. They both received SSI benefits. The DCFS reported that AP and DP were not responsible with their finances. They had not maintained an adequate home. They had lived for a time with DP's grandparents. The police had been called to the house due to fighting between AP and DP and between AP and DP's grandmother. Both DP and AP had been referred for mental health treatment, but were refusing to take their medications as prescribed. They were attending parenting classes and the DCFS was attempting to find an appropriate anger management class for them. According to the DCFS, they needed one-on-one counseling rather than group therapy.
During this time, ZP was living with BP and CP, who were seeking to be certified as foster parents and were willing to adopt the child. AP and DP were allowed to visit with ZP daily, as long as they were supervised by AP's parents. They did not visit daily, even though they lived less than one mile from AP's parents. A judgment was entered continuing ZP in DCFS custody. In September 2014, a court-appointed special advocate ("CASA") volunteer was appointed to the case.
On September 23, 2014, AP filed a motion seeking to have the court grant the guardianship of the child to her mother, BP. The DCFS raised concerns about BP due to prior reports to the agency. When AP was a baby, BP was married to a child molester and left AP in his care. This resulted in a positive report for failure to supervise AP. According to BP, that former husband is currently serving a life sentence for the molestation of another child, not AP. She divorced him and later married CP.
BP also had a valid report for physical abuse involving AP in 2002, but the DCFS could not locate the records from that report. Late in 2014, ZP was removed from BP's home and was placed with DW, BP's uncle, and his wife, PW, who are in their 60s. It was determined that ZP had ADHD and was mildly autistic. She was provided services to deal with those conditions. She also had surgery to place tubes in her ears due to frequent infections.
On January 22, 2015, the parties appeared in court for the hearing on the guardianship motion, but the matter was continued. The trial court expressed concern about AP's physical condition in court, noting that she was hardly able to stand up. BP said that AP was very emotional, they had taken her to a psychiatrist, and were taking her back there as soon as the hearing was concluded that day.
In March 2015, ZP had been in state custody for one year. The hearing on the motion for guardianship was finally held on April 27, 2015. AP testified that she wanted BP to be ZP's guardian. She stated that the family resides in a three-bedroom, two bathroom mobile home. BP and CP
*732 lived there, along with AP and AP's teenage brother, who has spina bifida and is paralyzed from the waist down.
DP also appeared and testified that he wished the guardianship of the child to be placed with BP and CP. AP and DP were separated at that point and planned to get divorced as soon as they had the money to do so.
BP testified that she had cared for ZP for more than one year and the child was removed from her home in late 2014, because of the two valid reports with DCFS concerning AP, discussed above. Because of these reports, BP could not be certified as a foster parent. BP stated that she accepted the fact that AP had disabilities and that she would have to be responsible for her. She said that when AP was five years old, she was told to have her sterilized. BP had no complaints about the care ZP was receiving from DW and PW.
The DCFS worker outlined the concerns with BP's prior valid reports. She also acknowledged that ZP was well cared for while with BP and CP. During the course of the proceedings, DW and PW, who were caring for ZP, were certified as foster parents. They planned to seek certification to adopt if ZP became available. The DCFS planned to request that the permanent case plan be changed from reunification to adoption. The court signed a judgment denying AP's motion to grant the guardianship of ZP to BP, and continued the child in DCFS custody.
Prior to the permanency hearing in April 2015, the DCFS filed a report with the court and recommended that the permanent case plan be changed to adoption. The CASA volunteer filed a report with the court which concluded that AP was too immature and childlike to parent a child at that point. ZP was observed to be happy and well-adjusted in the home of DW and PW.
At the permanency hearing on April 30, 2015, the DCFS worker testified that neither AP nor DP had made much progress with their case plans. They had attended parenting classes, but slept through many classes and missed some of them. They had not been taking their mental health medications as prescribed. AP could not tell the worker what medications she was taking. According to the DCFS, AP's mother prompted her to take her medications. AP had started anger management classes, which were ordered because of fighting between AP and DP. At one point she hit him in the head with a frying pan.
The DCFS did not think that AP or DP could care for ZP without outside help. AP had to be told everything to do for the baby. The DCFS did not rule out the possibility that AP could care for ZP in the future if she took care of her mental health issues. At the time of that hearing, AP was pregnant with a child not fathered by DP.
The trial court found that neither parent had completed their case plan, but AP had made more effort in addressing her mental health needs than she had in the past. The trial court found that the most appropriate permanent plan was adoption.
A case review hearing was held on October 12, 2015. AP had given birth to her second child on September 28, 2015. AP had been punctual with her visits to ZP, had finished batterer's intervention, and was working hard to follow her case plan. DP had visited with ZP, but had not done anything else to complete his case plan. Following the review hearing, the trial court signed and filed a judgment noting that the permanent case plan was adoption and not reunification.
On December 3, 2015, the DCFS filed a motion and order to approve a case plan which listed the permanent case plan as *733 reunification, with a secondary goal of adoption. On January 7, 2016, the trial court denied the motion, noting that the case plan had been changed to adoption.
In March 2016, ZP had been in state custody for two years. A permanency hearing was held on April 7, 2016. Prior to the hearing, the DCFS filed a report with the trial court expressing concern for ZP's risk of harm in the care of AP and DP. At the hearing, it was noted that AP had made progress, but the permanent case plan goal remained adoption. AP's mental health medication had been changed because she was pregnant again.
A review hearing was held on October 6, 2016. BP was allowed to remain in the courtroom because she had power of attorney to handle AP's legal matters and to help her understand the court proceedings. AP was opposed to continuing the permanent plan of adoption and her lawyer indicated that a motion to modify the plan to the goal of reunification would be filed. The trial court expressed surprise that no petition for termination of parental rights had been filed. The court stated that was where the case needed to head and noted that, "[I]f we're here for our next permanency review without that having been accomplished, then I will want a very good reason from the agency as to why that hasn't moved forward." In late October, 2016, AP gave birth to her third child.
In March 2017, ZP had been in state custody for three years. A permanency hearing was held on April 24, 2017. Prior to the permanency hearing, the DCFS report was filed. Mental health professionals informed the DCFS that they thought AP was not actually living with her mother and stepfather, but was living with her boyfriend at his home. AP's mental health assessment noted agitated feelings of sadness and stress due to her "mother's failing health" and the birth of the latest child. It was noted that AP had difficulty parenting her children due to her mental illness. DCFS had observed that during visitation, AP waited for her mother to take care of the two younger children. The mental health evaluation specified that AP would need assistance and supervision from a responsible adult to care for her children.
During a home visit, AP was observed to have difficulty remaining focused on the care of her two younger children. AP asked the DCFS workers, "When these two start school, can I get a puppy?" DCFS also noted that ZP was not placed with BP because of her prior history with the agency and, due to BP's caring for her teenage handicapped son as well as AP's two younger children, adding a third child to the already crowded home would not be in ZP's best interest.
Also in April 2017, AP and the father of the two younger children gave sole care, custody and control of them to AP's stepfather, CP. Following the hearing, the trial court maintained the permanent plan of adoption over the objection of AP and DP.
On October 23, 2017, a review hearing was held. The trial court observed that AP was doing much better in maintaining her mental health and was taking her medications and receiving counseling. She had completed parenting class and batterer's intervention. Her drug screens had been negative. The court found that DP had made some progress, but not as significant as AP. The agency had lost contact with DP and had not been able to do a recent drug screen.
The court noted that the DCFS recommended that the permanent plan be changed to reunification. The court rejected that recommendation, finding that the review hearing was not the proper forum to make such a change. However, the court *734 stated that it would allow AP to have visitation with ZP, unsupervised by the DCFS, but she still had to be supervised by BP. The court stated, "We'll start slowly with that and increase that contact over time provided that it goes well."
In March 2018, ZP had been in state custody for four years. Prior to the permanency hearing on April 30, 2018, the DCFS authored its regular report to the trial court on April 23, 2018, noting that AP's visitation with ZP was going well and that she had completed her case plan. DP tested positive for methamphetamines in June 2017, but was negative in August 2017. He had not completed his case plan. At the time of the letter, his whereabouts were unknown.
The report noted that, while visitation was held at the DCFS office, AP would bring the two younger children. BP came with AP. AP would lose focus, but regained it and was able to continue to interact with ZP. AP would focus more on her younger child, and had to be redirected to visit with ZP. The DCFS "had some concerns with [AP's] ability to parent without her support systems."
The DCFS reported that the unsupervised visits went well. This information was largely based upon the statements of BP and AP, although the DCFS did observe at least one visit. ZP stepped on a sibling's hand and AP was able to instruct her not to do that. The DCFS recommended that the case goal be changed from adoption to reunification and that the agency be allowed to start a transition toward a trial placement of ZP with AP.
The CASA volunteer's report filed with the court noted that AP was no longer with the father of her two younger children and was involved with a different man who had not been assessed by the DCFS. AP expressed the goal of moving out of BP and CP's home. The CASA volunteer was concerned about AP parenting without supervision and noted the lack of privacy in BP and CP's home due to the number of people living there. The CASA volunteer recommended that the child remain with the foster parents.
A permanency hearing was held on April 30, 2018. A DCFS social worker, Kourtney Harris, who had been assigned to the case for approximately one year, testified. ZP had been in DCFS custody for four years at that point. According to Harris, AP had been successful in completing her case plan, which included securing housing, accomplished by living with her parents; establishing income, satisfied by AP's SSI benefits; completing parenting classes; completing batterer's intervention; and complying with her mental health plan. She was taking her medications, attending monthly doctor appointments, and receiving weekly counseling. The DCFS recognized that the current case goal was adoption, but recommended changing it back to reunification, because AP had completed her case plan, was attending to her mental health, and had bonded with ZP.
Harris was questioned about AP's disability and the letter from the CASA volunteer stating that AP had to be supervised with ZP. According to Harris, BP had begun working outside the home three days a week, but her husband, CP, was always at home to provide supervision to AP. Harris stated that AP had bonded with all three of her children and seemed able to control them while they were playing. Currently, ZP was visiting in the home of AP's parents for four hours every week. BP still took AP to her mental health appointments. The latest mental health assessment on AP stated that she had to be supervised with the children.
AP had a new boyfriend who was being assessed by the DCFS. It appeared that *735 he had some criminal charges that the DCFS had not fully investigated. AP had expressed a desire to move out to live with her new boyfriend at some point in the future. According to Harris, if the boyfriend received clearance from the DCFS, he could be the adult to supervise AP with the children.
Harris was questioned about sleeping arrangements if ZP was returned to the home of BP and CP. Their home is currently occupied by six people. Harris stated that, if ZP was returned to the home, AP, ZP, and the two younger children would all occupy one bedroom. In the alternative, AP would sleep on the couch in the living room and the three children would occupy the bedroom.
Harris testified that the DCFS had been furthering the goal of reunification and not adoption. She stated that there were concerns about ZP being placed with PW and DW, with whom she had lived for almost four years. These included a report of inappropriate play between ZP and the adult son of PW and DW. However, Harris admitted that this report was determined to be unfounded. There was also concern about the age of PW and DW, who are in their 60s. PW had submitted a letter from her doctor showing that she was in good health.
Harris said that ZP never gave a direct answer about where she wanted to live. Sometimes the child expressed the desire to stay with DW and PW, and sometimes wanted to live with AP. Harris also stated that the agency recommended placing the guardianship of ZP with CP, AP's stepfather, who now has custody of AP's two younger children.
The trial court questioned Harris, who admitted that AP and DP had not provided financial support for ZP in the past year. She was asked why substance abuse treatment was not added to DP's case plan when he tested positive for drugs in August 2017. Harris stated that the agency "just didn't do it."
Harris said that AP's mental health diagnosis is bipolar disorder, mixed, with psychotic features, and she is on four different medications for her illness. Harris seemed unfamiliar with the case and, at one point, named only three of the medications taken by AP. Harris acknowledged that AP's last mental health report specified that she requires the assistance and supervision of a responsible adult to care for her children. Harris's unfamiliarity with the case was also demonstrated when she told the court that ZP could have been placed with BP and CP, in spite of BP's prior valid reports with the DCFS. She stated, "I guess it was just something that never came up going to get the child out of [PW and DW's] house and place the child back with the maternal grandparents."
The court asked Harris about questionable charges on the rap sheet of AP's current boyfriend. Harris refused to say what the boyfriend had been arrested for. During her testimony, it appeared that Harris was trying to communicate with someone else in the courtroom before answering the court's questions.
The trial court asked Harris about the DCFS report of April 23, 2018, referenced above, in which the agency expressed concerns about AP's ability to parent without her support systems. The report was signed by Harris and her supervisor. In her trial court testimony, seven days after the DCFS report, Harris said the agency had no concerns about AP. She stated that previously there had been concerns, but the DCFS no longer had those concerns.
AP testified at the hearing and outlined her compliance with her mental health care treatment. She stated that, even though she did not feel she needed to be *736 supervised with ZP, BP or CP was always present in the home. When asked why she thought she did not need supervision with the children, AP stated, "Because when all of my kids are together, they're happy and I feel like I can take care of my kids the way they are. I've got like, how do you say it, confidence that I can do it by myself."
BP testified and was asked whether AP needed to be supervised with the children. She said that the doctors and counselors said that AP needed supervision, but noted that another adult was always present in the home. She thought that AP needed "assistance" rather than "supervision." According to BP, it would be in ZP's best interest to have the family reunified.
The court determined that the evidence was overwhelming that the goal should remain adoption. The court noted for the record that DP had failed to comply with his case plan. The trial court found the testimony of Harris "was simply not credible today." In speaking about her testimony, the court stated:
Not only did she contradict herself, but she seemed very uncertain of her case and very uncertain of her responses. It is very difficult for this Court to understand the recommendation of the DCFS. The evidence is clear. The housing in this case is simply insufficient to have one more child in the household. It is also clear that while the mother is probably more stable at this point than I have ever seen her be she is - she is still not showing the stability that needs to be shown to appropriately parent [ZP].
While the trial court noted that AP was doing better, she was still making decisions which demonstrated instability, such as having two children with someone else while married to DP, and now being involved with a third man. The court observed that ZP had been in a stable placement for a long time and was making progress with her ADHD and autism. The trial court noted that BP's testimony was equivocal regarding the amount of assistance or supervision that AP would need with ZP. The court stated:
So, while the family wants to say that mom can do this with just minimal assistance, the reality is that's not the case. Another example of mom's lack of maturity in parenting was her testimony today that if [ZP] were home, all three children would be happy. And if all three children are together and happy, then she's able to parent them. And that simply is not the case. And again, I do think mom has made many strides and I encourage her to work to become stable. But I specifically find that she has not completed her case plan and that based on what I have to decide, considering this child's health and safety as a paramount concern, this is a child who has been in foster care for over four years now, her entire life. I find that the permanent plan that is most appropriate for her and in her best interest is the permanent plan of adoption. I hereby order DCFS to file a petition for termination of parental rights within thirty days, which would be on or before May the 30th. The Court doesn't normally do that, but the agency has demonstrated that it chooses to ignore this Court's order based on [the DCFS worker's] testimony today. The agency operated as though the goal were reunification when it was not. The Court will also order that visits between the mother and father will resume at the agency. They are to be supervised by the agency, and they will be in accordance with agency policy and will occur one time per month.
AP appealed the trial court judgment. She argues that the trial court erred in refusing to change the permanent case *737 goal from adoption to reunification, in changing her visitation with the child, and in ordering the state to file a petition for termination of parental rights.
LEGAL PRINCIPLES
The health, safety, and best interest of the child is the paramount concern in all CINC proceedings. See La. Ch. C. art. 601. A CINC proceeding is commenced by a petition filed by the district attorney. When authorized by the court, the DCFS may file a petition if there are reasonable grounds to believe that the child is a CINC. See La. Ch. C. art. 631. See also State in Int. of E.M. , 51,511 (La. App. 2 Cir. 6/2/17), 224 So.3d 1122.
Within 60 days after a child enters the custody of a child care agency, the custodian shall develop a case plan detailing the custodian's efforts toward achieving a permanent placement for the child. See La. Ch. C. art. 673. The case plan shall be designed to achieve the least restrictive, most family-like, and most appropriate setting available, and in close proximity to the parents' homes, consistent with the best interest and special needs of the child. The health and safety of the child shall be the paramount concern in the development of the case plan. See La. Ch. C. art. 675.
If, at any point in CINC proceedings, the child is removed from his parents' care and control and placed in the custody of the DCFS, the case review process of La. Ch. C. arts. 687 - 700 is implemented. The custodial agency shall file a case review report with the court or, if appropriate, with the administrative review body ten days prior to every scheduled review hearing. See La. Ch. C. art. 688. A review hearing shall be conducted by the court or administrative review body three months after the disposition hearing if the child was removed prior to disposition or within six months after the disposition hearing if the child was removed at disposition, but in no case more than six months after removal of the child from his parent(s). Case reviews shall continue to be held at least once every six months thereafter until the child is permanently placed, or earlier upon the motion of a party for good cause shown or on the court's own motion. La. Ch. C. art. 692.
Regarding permanency hearings, La. Ch. C. art. 702 provides, in pertinent part:
B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
....
E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable *738 efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.
....
G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court will advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.
More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Int. of S.M. , 1998-0922 (La. 10/20/98), 719 So.2d 445 ; State in Int. of C.S ., 49,955 (La. App. 2 Cir. 3/18/15), 163 So.3d 193 ; State in Int. of P.B ., 49,668 (La. App. 2 Cir. 12/17/14), 154 So.3d 806. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. State in the Int. of S.M. , supra ; State in Int. of P.B. , supra . Children need permanency and stability, and forcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child. State in Int. of J.M.L. , 47,201 (La. App. 2 Cir. 4/11/12), 92 So.3d 447. While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to ensure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. State in Int. of C.S. , supra .
In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. See La. Ch. C. art. 702(C)(1) ; State in Int. of P.B., supra .
In the context of both termination of parental rights and evaluation of permanency plans, the courts have used a reformation test to determine if a plan of reunification is consistent with the best interest and special needs of a child. This test evaluates whether there is an expectation of reformation of a parent's conduct. Conduct such as behavioral or mental disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although not all of the problems that exist have been eliminated. State in Int. of P.B. , supra .
Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency *739 plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. State in Int. of P.B., supra .
One factor considered in the termination of parental rights is if there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home. See La. Ch. C. art. 1015(5) ; State ex rel. H.A.S. , 2010-1529 (La. 11/30/10), 52 So.3d 852. This element may be shown by one or more of the following, set forth in La. Ch. C. art. 1036(D) :
D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
.....
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
Mental illness or deficiencies, standing alone, are insufficient grounds to warrant termination of the parent's rights. However, the mental deficiency related to parenting ability can lead to termination of parental rights. State ex rel. J.P.A. , 2005-1160 (La. App. 3 Cir. 4/19/06), 928 So.2d 736 ; State in Int. of C.V.W. , 48,166 (La. App. 2 Cir. 4/10/13), 113 So.3d 1202. In some cases, the deficiencies of a parent in intellect and functioning make it unlikely that he or she will ever have the judgment necessary to parent children. See State in Int. of T.P. , 51,172 (La. App. 2 Cir. 11/16/16), 209 So.3d 1015 ; State in Int. of J.M.L., supra ; State ex rel. J.Y.M. , 2010-841 (La. App. 3 Cir. 12/8/10), 53 So.3d 607 ; In re TMS , 2008-810 (La. App. 3 Cir. 11/5/08), 999 So.2d 21 ; State ex rel. M.M. , 2005-1598 (La. App. 3 Cir. 9/27/06), 939 So.2d 707 ; State ex rel. J.M. , 2002-2089 (La. 1/28/03), 837 So.2d 1247 ; State in Int. of WS , 626 So.2d 408 (La. App. 1 Cir. 1993). The impairment must expose the child to a substantial risk of harm, and that risk must be substantiated by expert testimony or by a pattern of risk to the child from the parent's acts or omissions. State in Int. of J.H. , 51,100 (La. App. 2 Cir. 11/16/16), 209 So.3d 1001.
To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. State in Int. of C.S. , supra . In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in Int. of N.C. , 50,446 (La. App. 2 Cir. 11/18/15), 184 So.3d 760 ; State in Int. of P.F. , 50,931 (La. App. 2 Cir. 6/22/16), 197 So.3d 745.
Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. If the juvenile court's findings are reasonable in *740 light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. State in Int. of P.F. , supra . State in Interest of E.M. , supra .
DISCUSSION
On appeal, AP contends that the trial court erred in failing to change the permanent plan from adoption to reunification. She argues that the trial court erred in terminating her weekly in-home visitation and ordering that AP could visit with ZP once a month, at the agency, supervised by the DCFS. AP also asserted that the trial court abused its discretion in ordering that the state file a petition to terminate parental rights in this case.[1] AP's arguments are without merit.
Permanent Case Plan Goal
The trial court did not err in refusing to change the permanent case plan goal from adoption to reunification. AP claims that the trial court decision not to change the permanent case plan goal from adoption to reunification was based on several erroneous conclusions. She maintains that the trial court was wrong in saying that she did not complete her case plan, that the housing with her mother and stepfather was insufficient, and in expressing concern about AP's latest boyfriend and his possible criminal background. She also claims that the trial court erred in concluding that Harris's testimony was not credible.
AP acknowledges that she did not work her case plan for the first six months that ZP was in DCFS custody. However, she argues that she later began working the case plan and contends that she completed it by March 2016. She maintains that the concerns about her parenting ZP without supervision were alleviated by October 2017. She also claims that, if her current boyfriend is found to have a criminal background, she will stop seeing him.
Based upon our review of the record, AP's arguments are not supported. The record shows that AP is severely mentally ill. The case plan goal was originally reunification, but, as AP admits, she did not work her case plan for some time. Although she completed parenting classes, the record shows that she missed many of the classes and slept through others. At the permanency hearing held in April 2015, it was determined that AP was not working her case plan and was pregnant with another child that did not belong to her husband. At that point, the case plan goal was changed to adoption. By late 2015, after the birth of her second child, AP was working her case plan, but the trial court denied the DCFS motion to change the permanent goal from adoption back to reunification.
By April 2016, ZP had been in state custody for two years. AP had made some progress on her case plan, but was pregnant with her third child, who was born in October 2016. The record shows that between March 2016 and April 2017, AP's stability actually regressed. By this point in the proceedings, it was clear that AP required constant supervision while with ZP and could not manage her children on her own. It was also apparent that AP required the extensive assistance of her mother, BP, in order to manage her mental illness. AP lived with her mother and stepfather. Her mother made sure that she took her mental health medications and took AP to medical and counseling appointments. BP obtained a power of attorney *741 to allow her to remain in the courtroom at the hearings in this matter in order to assist AP in understanding the proceedings. The psychiatric evaluation of AP cited by the court stated that AP had to be supervised when she was with her children. That evaluation has never changed.
In April 2017, AP and the father of the younger children gave sole custody of them to AP's stepfather. This action by AP, in relinquishing custody of the younger children, does not support her argument that AP's mental illness was sufficiently improved to the point that she could parent her children without supervision.
In October 2017, the trial court again rejected the DCFS's recommendation to change the permanent plan to reunification from adoption. AP still needed supervision while with ZP. The record does not support AP's argument that, by this point, all concerns regarding her parenting without supervision had been alleviated.
At the time the permanency hearing was held in April 2018, ZP had been in state custody for four years. The record shows that AP had not financially supported ZP as required by her case plan. Over the course of this matter, the record contains only two checks for $40 each given for the support of ZP. Those checks were written by BP on her personal account in December 2015, and January 2016. The record also shows that, while AP continues to need supervision while with ZP, BP has been working more outside the home and is not available to supervise AP, although AP contends that when her mother is not at home, her stepfather is present. It must be remembered that the DCFS determined that custody of ZP could not be placed with BP because of her prior valid reports with the agency. The factors that made custody or guardianship to BP inappropriate have not and will not change. If ZP is returned to AP, the practical effect will be to place the child in the care and custody of BP.
The trial court did not err in observing that the home of BP and CP, which is small and now houses six people, would be further strained if ZP were returned to the home, and that this overcrowding would not be in ZP's best interest. A prior DCFS report also found that returning ZP to the house of BP and CP would not be in ZP's best interest.
The trial court did not err in expressing concern that AP's new boyfriend might have a criminal record. The DCFS had not examined his background. However, Harris opined that, if the new boyfriend did not have a criminal record, he could be the responsible adult to supervise AP as she tried to parent ZP.
The trial court did not err in rejecting the testimony of Harris at the permanency hearing. The trial court correctly observed that Harris's testimony was diametrically opposed to the DCFS report written only seven days before the hearing. Harris did not appear to be entirely familiar with the medications AP was taking. Harris also seemed to think that there was no problem with removing ZP from the home of DW and PW and placing her back in the home of BP in spite of BP's prior valid reports with the agency which prevented her from having custody of the child. Further, even though a thorough investigation of AP's new boyfriend had not been completed, Harris had considered that he could supervise AP with ZP and the other children.
In her brief, AP argues that the trial court was required to follow the opinion of the DCFS worker, similar to the deference afforded the trial court by a reviewing court. We completely reject this argument which is unfounded in the law. The trial court has presided over this case since its inception and is familiar with its progress.
*742 Harris, the DCFS case worker, has worked on this case for a very short time and exhibited a lack of familiarity with the history of this matter and a lack of regard for the trial court's ruling that the permanent case plan goal was adoption.
We also note that the trial court maintained that the permanent case plan was adoption since that goal was set in April 2015. It never misled the DCFS into thinking that the case plan had been changed to reunification. The trial court was not manifestly erroneous or clearly wrong in refusing to change the permanent case plan goal from adoption to reunification.
Visitation
The trial court did not err in changing visitation to once a month, supervised by the DCFS. The permanent case plan goal had been adoption since April 2015. The trial court never changed that goal. In October 2017, the trial court allowed more visitation with fewer restrictions, cautioning that it was moving slowly. The DCFS incorrectly interpreted this as an indication that the case plan goal was changed to reunification. At the hearing in April 2018, when the trial court returned visitation to the prior schedule of once per month, at the DCFS office, supervised by the DCFS, it acted in accordance with maintaining the permanent case plan goal of adoption. The trial court was not manifestly erroneous or clearly wrong in making this change.
Termination of Parental Rights
The trial court did not err in ordering the state to file a petition to terminate parental rights. At any time, including in any hearing in a CINC proceeding, the court on its own motion may order the filing of a petition to terminate parental rights on any ground authorized by La. Ch. C. art. 1015. See La. Ch. C. art. 1004(A). As stated above, children need permanence and stability. Forcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child.
This record is replete with what AP and BP seem to think is in their best interest, with little regard for the best interests of ZP. The record shows that ZP has been in the custody of the DCFS for four years. AP has been given ample opportunity to follow her case plan and to demonstrate, if possible, that she could safely parent ZP and that returning ZP to AP would be in the child's best interest. During this time, AP's progress has been slow and, at times, nonexistent. Stretching a timetable to allow more time to prove ability as a parent is indicative of placing the parent's interest over those of the child. See State ex rel. J.P.A. , supra .
At the termination hearing, the parties may present evidence and the trial court shall consider whether termination is in the child's best interest. See La. Ch. C. art. 1034. At the hearing, the petitioner will bear the burden of establishing each element of a ground of termination of parental rights by clear and convincing evidence. See La. Ch. C. art. 1035. The trial court was not manifestly erroneous or clearly wrong in ordering the state to file a petition for the termination of parental rights.
CONCLUSION
For the reasons stated above, we affirm the trial court decision maintaining the permanent case plan goal of adoption; ordering that visitation be once per month at the DCFS office, supervised by the DCFS; and ordering the state to file a petition to terminate parental rights. Costs in this court are assessed to AP.
AFFIRMED .

The state filed a brief noting that it was aligned with AP's position in the permanency hearing, but it took no position on this appeal. Also, the child has not appealed the decision.