Judgment rendered August 11, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,029-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
Z.J.

* * * * *

Appealed from the
Caddo Parish Juvenile Court
Parish of Caddo, Louisiana
Trial Court No. 163,120A

Honorable David N. Matlock, Judge

* * * * *

| | |
|---|---|
| CINC APPELLATE PROJECT<br>By:  The Harville Law Firm, LLC<br>     By:  Douglas Lee Harville | Counsel for Appellant,<br>S.J., Mother |
| SARAH S. MIDBOE HOOD<br>TOMMY J. JOHNSON<br>Assistant District Attorneys | Counsel for Appellee,<br>State of Louisiana |
| CHILD ADVOCACY PROGRAM<br>By:  Reneé Paula Coté | Counsel for Appellee,<br>Z.J., Child |
| KIMBERLY S. SMITH | Counsel for Appellee,<br>State of LA, DCFS |

* * * * *

Before PITMAN, STEPHENS, and ROBINSON, JJ.

**PITMAN, J.**

Plaintiff S.J. appeals the judgment of the juvenile court which permanently placed her child, Z.J., who had been adjudicated a child in need of care, in the guardianship of foster parents who had custody of Z.J.'s half-sister, rather than in the home of a maternal aunt and uncle preferred by S.J. For the reasons stated below, we affirm.

### FACTS

On October 30, 2020, S.J. gave birth to Z.J. in Shreveport. At the time of the birth, S.J. was incarcerated at Caddo Correctional Center ("CCC") after her arrest in May 2020 for the murder of her nine-month-old son, H.J., and the physical abuse of her daughter, R.B., who had two broken legs, a lacerated liver and other evidence of physical abuse. Z.J.'s alleged biological father, J.H., was also arrested in May 2020 for the physical abuse of R.B., but was able to make bail and was not in jail at the time of Z.J.'s birth. It was later determined that he was not Z.J.'s father.

The Department of Children and Family Services ("DCFS") employee Danielle Turner interviewed S.J. on November 1, 2020, two days after Z.J.'s birth. S.J. admitted that she and J.H. were arrested in May 2020 on their pending charges. She told Turner that she was a habitual marijuana user and that she suffered from seizures, schizophrenia and bipolar disorder. She also reported that her mother was a crackhead living in Shreveport and asked that her child be placed in the home of her aunt and uncle, the Westons. At the time of the interview, S.J. did not know the Westons' phone number. Turner reviewed the agency records and found a validated history in March and May 2020 of the parents' physical abuse of R.B. and H.J. The records noted

that H.J. had head and facial injuries, cuts, whiplash-shaken infant syndrome, internal injuries and bone fractures.

Because there was no one to claim Z.J. after her birth, the DCFS filed an affidavit for an instanter order to determine her to be a child in need of care due to the substantial and immediate danger to her health and safety. It alleged that removal of the child was necessary to safeguard her welfare because of neglect or dependency. At the time Z.J. was born, her sister, R.B., had been placed with the Coxes, a foster care family, and the DCFS wanted to place Z.J. with that same family. The instanter order was issued on November 2, 2020, and Z.J. was placed in the Coxes' home with R.B.

On November 9, 2020, continued custody proceedings took place and all parties stipulated to the affidavit filed in support of the instanter order. On December 20, 2020, a petition was filed to have Z.J. adjudicated as a child in need of care. In January 2021, an adjudication hearing was held to determine the appropriate disposition; and, at the commencement of the hearing, a stipulation to the testimony in the petition, absent obvious hearsay and absent one paragraph, was entered, with the court taking judicial notice of the petition.

At the hearing, S.J. called the Westons to testify. Ms. Weston stated that she became aware of S.J.'s pregnancy about a week before S.J. went to jail for hurting the children.[1] She testified that, at that time, the children did not have any visible injuries and showed no signs of pain. She stated that she learned of H.J.'s death when her husband's sister, B.J. Johnson, called and

---

[1] Mr. Weston stated that S.J. visited their family at Easter (April 12, 2020), approximately three weeks before H.J. died and S.J. was arrested for injuries to him and R.B.

told them, but she was "hollering and crying" and they could not fully understand what she was saying. Ms. Johnson called them a day later after she had calmed down and explained the situation. Ms. Weston stated that she and her husband did not attend H.J.'s funeral (she was suffering from a broken knee and he had to go to work), but their children did attend.

After S.J. was arrested, the Westons went to the CCC to see her a few days before she gave birth, and it was at that time that S.J. discussed their taking care of her baby who was about to be born. Ms. Weston testified that S.J. told them she was attempting to get in touch with Cynthia Terrell, a DCFS child welfare specialist, to tell her that she wanted her baby to be placed with them; but, by the time they found out about the baby's birth, Z.J. had already been removed from the hospital and placed "in process."

Ms. Weston stated that prior to Z.J.'s birth, she underwent a background check, submitted her fingerprints, was doing Trust-Based Relational Intervention training and did "all my other things for my certificates for the CPR and everything also," in anticipation of having the child placed with them. She also indicated that she was willing to have both children come live with them and noted that she had grandchildren with whom R.B. and Z.J. could play.

Mr. Weston testified that he had raised seven children. He further stated that when he observed H.J. and R.B, they had no difficulty walking, crawling or rolling around.

After this testimony, Z.J. was adjudicated to be a child in need of care. The trial court began the disposition portion of the hearing immediately.

The disposition hearing began with the trial court taking judicial notice of the record in docket numbers 163,120 and 163,120A, which were

3

motions for guardianship of R.B. and Z.J., respectively. The state suggested that they should be considered together since the ruling on the permanency of guardianship for R.B. might influence Z.J.'s disposition. Despite the state's suggestion, other parties present, especially R.B.'s biological father who was still seeking reunification with R.B., objected to the consideration of R.B.'s guardianship prior to Z.J.'s issues. His attorney and others stated that it was not in their clients' best interest to consolidate the issues, specifically because R.B.'s father had no interest in a determination of Z.J.'s status or disposition. The trial court decided to determine Z.J.'s issues first without regard to R.B.'s issues.

The state introduced evidence from the DCFS and the Court-Appointed Special Advocate ("CASA"), which provided a history of the case and supplied specific dates, reasons for actions taken, the names of persons attending family team meetings and case status. The evidence showed that despite claims of being a tight-knit family, the Westons did not find out about Z.J.'s birth until after the child had been placed in the state's custody. Ms. Weston testified that she would be willing to take R.B.; however, during the five- or six-month period before Z.J.'s birth, S.J. had never offered or suggested that R.B. be placed with them. In fact, they did not know R.B. had been placed in the state's custody until the end of August, after S.J. was arrested. The first date the Westons were involved in any proceeding regarding Z.J. was January 28, 2021.

The documents show that the Westons had not attended any of the family team meetings. The CASA had been involved with the family regarding R.B. since the beginning of May 2020. The reports show that the Coxes had been providing excellent care for R.B. and meeting her special

needs since May 2020. Z.J. had been diagnosed with a heart murmur, and an early intervention by a heart specialist had been scheduled. The CASA report demonstrated a high level of concern for R.B.'s and Z.J.'s safety regarding appropriate contact with their families of origin and noted that their needs were currently being met by the Coxes. A seven-page, foster parents progress report recommended that their placement with the Coxes was in their best interest and that the Coxes provided them the best opportunity to thrive and survive.

Ms. Terrell testified that she was called after Z.J. had already been placed in the Coxes' home with her sister, R.B. It was at that time she learned S.J. had suggested placement with the Westons, so she attempted a home study; but, as of the date of the hearing, the study was incomplete. Thus, the Westons were not cleared as an appropriate placement for Z.J.

At the hearing on January 28, 2021, the trial court determined that permanent guardianship of Z.J. would be granted to the Coxes as the least restrictive disposition consistent with the needs of the child, i.e., her health, safety and welfare and being provided a stable home. The trial court noted that by placing her with the Coxes, she would have contact with her only sibling. Several parties at the hearing objected to the placement of Z.J. with the Coxes rather than with the Westons, who were relatives, and one attorney noted that there had been no evidence presented establishing why it would be detrimental to Z.J. to be placed in the home of a relative rather than with the Coxes. The trial court responded that:

> [t]his more has to do with the safety of this child being at large so to speak and susceptible of coming into contact with the child's mother or punitive (sic) father and the extreme danger that would be presented to this child for that, and that the best and safest way to keep this child safe from becoming a victim

5

of homicide or severe physical abuse from either or both parents and from a neglectful eye of family members is to keep the child where it currently is.

The trial court also noted that by its granting of guardianship to the Coxes for the length of Z.J.'s minority, she would not be placed indefinitely in the foster care system.

The judgment was signed on February 24, 2021. The trial court's findings of fact and reasons for judgment state as follows:

1. It is not in the child's best interest to be placed in the home of an adult family member;

2. The child's safety and ability to thrive and survive is best protected by the child continuing to live in the home in which she is currently placed. The considerations upon which this finding is made include, but are not limited to, the nature and extent of the injuries, abuse, neglect and death sustained by the child's biological siblings [R.B. and H.J.]. The Court finds that the abuse and neglect of [R.B. and H.J.] was not a singular event, but was rather an ongoing failure of the children's mother, her boyfriend, [J.H.], and the mother's relatives to recognize and acknowledge the apparent danger to the children and to provide protection from their continued harm. The Court finds that the best, safest, and least restrictive way to keep this child protected from becoming a victim of homicide or severe physical abuse from her mother and from a neglectful eye of family members is to keep the child in her current placement, under guardianship with [the Coxes].

3. Additionally, in the current placement, the child resides with and has full access to her only known living biological sibling, [R.B.] and in the event of removal of [R.B.] from placement, and placement of [R.B.] with [R.B.'s] father or linearly related members of [R.B.'s] father, reasonable arrangements may be made to facilitate the sibling relationship without exposing this child's sibling, [R.B.], to the risk of emotional and physical harm from visits with mother's family and from direct or indirect contact with mother. Finally, clear and convincing evidence supports, and there is no evidence presented to contest, the suitability of [the Coxes] as guardians of the child, with whom the child has gained stability and permanence. The Court finds that the Coxes are willing and able to provide a safe, stable and wholesome home for the child for the duration of her minority.

6

S.J. now appeals the decision of the trial court.

## DISCUSSION

### *Insufficiency of the Evidence*

S.J. first assigns as error that the trial court was manifestly erroneous and clearly wrong when it found that it was not in Z.J.'s best interest to be placed in the home of the Westons (adult family members).

S.J. argues that the trial court's errors are based on the insufficiency of the evidence to support its decision to place Z.J. with a non-family member, rather than with the relatives ready and able to care for her.

S.J. argues that there was no proof presented at the hearing that placement with the Coxes would be better than her preferred placement with relatives who were willing and able to have Z.J. in their care. She contends that because Z.J. is an infant, it would not be harmful to remove her from the home she was placed in at birth.

The state contends that the record supports the findings of fact and reasons for judgment given by the trial court. It contends that S.J. ignores the fundamental purpose of the law regarding a child in need of care, which is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect or exploitation and who may be threatened by the conduct of others. It argues that reunification is not required if the child could be subjected to egregious conduct and condition by the parent or relatives. It further argues that after seeing and hearing the evidence, the trial court concluded that placement in guardianship with the Coxes was the best and least restrictive disposition considering the child's health, safety and best interests.

7

La. Ch. C. art. 601 defines the purpose of the Child in Need of Care laws as to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect or exploitation and who may be further threatened by the conduct of others, by providing for the reporting of suspected cases of abuse, exploitation, or neglect of children. Proceedings shall be conducted expeditiously to avoid delays in achieving permanency for children and is intended to provide the greatest possible protection as promptly as possible for such children. *Id*. The health, safety and best interest of the child shall be the paramount concern in all proceedings regarding children in need of care. *Id*.

More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445; *State in Int. of Z.P.*, 52,354 (La. App. 2 Cir. 9/26/18), 255 So. 3d 727.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of C.S.*, 49,955 (La. App. 2 Cir. 3/18/15), 163 So. 3d 193. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Int. of P.F.*, 50,931 (La. App. 2 Cir. 6/22/16), 197 So. 3d 745. If the juvenile court's findings are reasonable in light of the record, the appellate court may not reverse, even though convinced had it been sitting as the trier of fact, it would have weighed the evidence differently. *State in Int. of H.J.*, 53,299 (La. App. 2 Cir. 3/4/20), 293 So. 3d 97.

La. Ch. C. art. 681 concerns dispositional alternatives and states in pertinent part as follows:

> A. In a case in which a child has been adjudicated to be in need of care, the child's health and safety shall be the paramount concern, and the court may do any of the following:
>
> (1) Place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child including but not limited to the issuance of a protective order pursuant to Article 618.
>
> ***
>
> (4) Grant guardianship of the child to a nonparent.
>
> (5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child.

La. Ch. C. art. 683, which concerns dispositions, generally, provides that the court shall impose the least restrictive disposition of the alternatives enumerated in article 681 which the court finds is consistent with the circumstances of the case, the health and safety of the child and the best interest of society. La. Ch. C. art. 683(B) states that the court shall place the child in the custody of a relative, unless the court has made a specific finding that such placement is not in the best interest of the child. The court shall give specific written reasons for its findings, which shall be made a part of the record of the proceeding.

La. Ch. C. art. 702[2] concerns the permanency hearing and states in pertinent part as follows:

> C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:

---

[2] La. Ch. C. art. 702 was amended by 2021 La. Act No. 350, effective June 17, 2021.

(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.

(2) Adoption.

(3) Placement with a legal guardian.

(4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.

(5)(a) Placement in the least restrictive, most family-like alternative permanent living arrangement. The department shall document in the child's case plan and its report to the court the compelling reason for recommending this plan over the preceding higher priority alternatives.

(b) The permanent plan provided for in this Paragraph may be considered only if the child is sixteen years of age or older.

D. The court shall consider a child's need for continuing contact with any relative by blood, adoption, or affinity with whom the child has an established and significant relationship in accordance with Article 1269.2 as one of several factors in determining the permanent plan that is most appropriate and in the best interest of the child.

La. Ch. C. art. 722(C) requires the trial court to enter a written order at the end of the hearing approving guardianship, and that order must include the findings upon which the order is based.

In the case at bar, the trial court issued oral reasons for judgment, as well as written reasons, which clearly stated that it was in Z.J.'s best interest for guardianship to be granted to the Coxes and that their home was the least restrictive way to keep the children protected from becoming victims of homicide or severe physical abuse. Further, the Coxes' home was deemed the best place for Z.J. to thrive and to live with her only living sibling.

The trial court's reasons for judgment took judicial notice of the entire record in the case, including the record as it related to R.B., the abused sibling, whose condition upon her placement with the Coxes was extremely dire, i.e., a lacerated liver and two broken legs. The Westons, although claiming to have close family ties with S.J. and her family, were unaware that R.B. had been severely injured at the time of her mother's arrest and, further, assumed that R.B. had been living with her maternal aunt, B.J. Johnson, after S.J. was arrested. It was not until five months after S.J.'s arrest that the Westons discovered R.B. had been placed with a foster family, and it was at that time that they visited her in the CCC and she asked them to care for her child, Z.J. She never suggested to them that they take care of R.B. These facts belie the Westons' claim that they had a close family tie with S.J.'s children.

The trial court's judgment and reasons for judgment included the awareness that R.B. might not always live at the Coxes' home if her biological father obtained custody of her; but it noted that, at least, by placing her in their home, she would be protected from contact with S.J. or S.J.'s family, which turned a neglectful eye to the abuse that was being suffered by the children in their mother's home. The trial court's judgment clearly supports the purpose of the law which is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others. Accordingly, the decision to place Z.J. under the guardianship of the Coxes was in her best interest.

For the foregoing reasons, we find there was no manifest error in the decision of the trial court and this assignment of error is without merit.

11

*Costs of Appeal*

We note that S.J. was allowed to proceed on appeal as a pauper. La.

C.C.P. art. 5188 states that except as otherwise provided in La. C.C.P.

art. 1920 and La. C.C P. art. 2164, if judgment is rendered against a party

who has been permitted to litigate without the payment of costs, he shall be

condemned to pay the costs incurred by him in accordance with the

provisions of La. C.C.P. art. 5186. That code article states in pertinent part

that:

> [i]f a judgment is rendered against the indigent plaintiff and he
> is condemned to pay court costs, an affidavit of the account by
> an officer to whom costs are due, recorded in the mortgage
> records, shall have the effect of a judgment for the payment
> due.

## CONCLUSION

The judgment of the trial court granting guardianship of the child Z.J.

to the Coxes is affirmed. Costs of this appeal are assessed to S.J.

**AFFIRMED.**

12