Judgment rendered April 8, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,852-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
C.L. (DOB 07/12/2017)

* * * * *

Appealed from the
Monroe City Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2023-J-00159

Honorable Angie D. Sturdivant, Judge

* * * * *

| | |
|---|---|
| CINC APPELLATE PROJECT OF THE OFFICE OF THE STATE PUBLIC DEFENDER<br>By: Annette Fuller Roach | Counsel for Defendant-Appellant, K.W., Mother |
| BRITTANY SULLIVAN LENARD | |
| LEGAL AID OF NORTHWEST LOUISIANA<br>By: Elizabeth Clement Brown | Counsel for Plaintiff-Appellee, C.L., Minor Child |
| ALLISON M. COOPER<br>Assistant District Attorney | Counsel for Plaintiffs-Appellees, State of Louisiana and State of Louisiana DCFS |
| JULIE TOMS | In Proper Person, Intervenor-Appellee |

GERALD WALKER                              In Proper Person,
                                           Intervenor-Appellee

* * * * *

Before STONE, STEPHENS, and MARCOTTE, JJ.

**STEPHENS, J.**,

This appeal arises out of the Monroe City Court, Parish of Ouachita, State of Louisiana. The mother, K.W., has appealed from an adverse judgment which changed her case plan goal from reunification to adoption and denied her request to grant guardianship of the minor child to K.W.'s sister. For the following reasons, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

On June 19, 2023, the Department of Children and Family Services ("DCFS") in Ouachita Parish received a report which alleged neglect-lack of adequate supervision concerning the minor child, C.L., who was born on July 12, 2017.[1] This report was filed after law enforcement officers had been called to a gas station where C.L.'s mother, K.W., had passed out at a gas pump with C.L. present in the vehicle. Kimberly Carodine, a DCFS employee, spoke with C.L.'s father, S.L., following the incident. S.L. informed Ms. Carodine that K.W. had a history with crack cocaine, but S.L. denied any drug use other than his prescribed medication and stated that he would submit to a drug screen. Ms. Carodine then conducted a walk-through of the family residence and observed that the home appeared to be clean and adequate with utilities being on and operable.

On June 27, 2023, K.W. and S.L. submitted hair follicle and urine drug screens. Both hair follicle drug screens were positive for cocaine and components of cocaine. On July 19, 2023, Ms. Carodine confronted K.W. and S.L. about the positive drug screens. DCFS implemented a safety plan that became effective on that same date. V.S., an older daughter of S.L.'s,

---

[1] In December 2020, C.L. was diagnosed as being on the autism spectrum.

and S.S., a friend of K.W.'s, agreed to be safety monitors. DCFS records showed that K.W. had prior history of neglect reported in July 2011, September 2014, and May 2016.[2]

On July 24, 2023, Ms. Carodine filed an affidavit in support of an instanter order for removal and award of provisional custody to DCFS. In this affidavit, Ms. Carodine averred that the parents are unable to, unwilling to, or do not provide the necessary supervision, protection, or care, and an child's safety is of serious concern. On that same date, the court issued the instanter order placing C.L. in the provisional custody of the State through DCFS. A continued custody hearing was scheduled for July 27, 2023. C.L. was placed in the certified foster home of C.R. and A.R., the adoptive parents of C.L.'s half-sister, in West Monroe, Louisiana, on July 24, 2023. At the continued custody hearing on July 27, the trial court confirmed C.L.'s foster home placement.

On August 18, 2023, the State of Louisiana filed a petition to declare C.L. a child in need of care. On September 20, 2023, the State and DCFS filed a motion and order to approve the case plan which the trial court approved. The Plan's goal was reunification.

On February 6, 2024, the trial court ordered that DCFS be relieved from custody of C.L. and that he be returned to the custody of his parents, K.W. and S.L., with DCFS to be involved and a safety plan put in place. Just two and a half months later, DCFS filed an affidavit in support of an

---

[2] In each instance, the records showed that K.W. had a long history of cocaine abuse and that she used cocaine during her pregnancies. In 2011, K.W.'s child tested positive for cocaine at two days old. K.W. ultimately surrendered her parental rights, and the child was freed for adoption. In 2014, K.W. and her child tested positive for cocaine, and the case was open from September 2014 through April 2015 but was closed as "Now with Parent." Similarly, in 2016, K.W. used cocaine while she was pregnant; the case was open from May 2016 through September 2017 and closed as "Now with Parent."

instanter order for removal and provisional custody to DCFS on April 26, 2024, alleging that it had received a report that K.W. and S.L. continued to use and sell drugs in front of C.L.  Additionally, C.L.'s teacher reported that the child had been sleeping at school and had been absent for three days.  The trial court issued the instanter order on that same date.  C.L. was again placed in foster care with C.R. and A.R., C.L.'s adoptive half-sister's parents.

The State filed another petition to declare the child in need of care on May 15, 2024.  C.L.'s biological father, S.L., died on June 9, 2024.  On July 2, 2024, the trial court determined that the State proved its allegations and adjudicated C.L. as a child in need of care.  On September 24, 2024, a DCFS report indicated that following S.L.'s death, K.W. declared that she wanted to give guardianship of C.L. to her sister, J.T.  On October 1, 2024, K.W. filed a motion for guardianship proposing that J.T., the maternal aunt, be appointed as C.L.'s guardian.  According to K.W., guardianship rather than adoption or reunification was in C.L.'s best interest.  The trial court ordered an expedited Interstate Compact on the Placement of Children[3] ("ICPC") home study report for the maternal aunt, J.T., in New Jersey.

On February 3, 2025, J.T. and G.W., C.L.'s maternal aunt (K.W.'s sister and her husband), filed a petition for intervention, alleging their desire to be the permanent placement for C.L.  In the petition, J.T. and G.W. indicated that they had been licensed by the New Jersey Department of Children and Families as a resource family home and had completed a home study.  On February 3, 2025, the trial court ordered that J.T. and G.W. be

_____

[3] See, La. Ch. C. art. 1623, *et seq.*

permitted to intervene and participate in the permanency review proceedings. On March 10, 2025, J.T. and G.W. filed a petition for visitation, alleging that, prior to and following their certification as a resource family home in New Jersey, they had been unjustifiably denied visits with C.L. on multiple occasions. They also alleged that they had been denied permission to fully engage and participate in court-ordered FaceTime and phone calls with C.L.

In its motion to clarify and/or stay visitation filed on March 17, 2025, DCFS alleged that it was unclear whether the court had issued an actual order of visitation. Instead, DCFS alleged that C.L. wanted to shorten the duration of visits with J.T. Similarly, DCFS pointed out that the court directed the visits to be limited to one hour, twice monthly, and 15 minutes, twice monthly, on alternating week intervals. DCFS also indicated that J.T. had engaged in conduct that was disruptive to the foster home placement, such as making calls to law enforcement to respond to the foster home without legitimate cause, creating chaos and disruption in the foster home through repeated phone calls and texts, and causing emotional distress to the other children in the foster home who did not participate in the visits. The trial court issued an order on March 17, 2025, in which it clarified that there was no formal visitation order establishing visitation for J.T. and G.W. with C.L., and any visits provided had been courtesy visits at the discretion of DCFS.

The State filed an opposition to the intervention petition filed by J.T. and G.W. on April 7, 2025, in which it argued that J.T. and G.W. had failed to demonstrate that their intervention would facilitate permanent placement for C.L. or ensure that C.L.'s best interests were protected. On that same

date, DCFS filed a similar objection and alternatively requested limited intervention. On April 11, 2025, a report was filed into the record from C.L.'s Court Appointed Special Advocate ("CASA"). This report recommended that there be a change in the case goal from reunification to adoption. The report recommended that C.L. be permanently placed with his foster family through adoption, that K.W.'s parental rights be terminated, and that visitation with J.T. and G.W. cease due to C.L.'s emotional well-being and stability.

On April 30, 2025, the trial court issued an order allowing J.T. and G.W. to be given a copy of the ICPC "Approval or Disapproval Letter," in which everything was redacted except the ultimate determination as to whether there was an approval or disapproval. On that same date, the trial court also denied DCFS's motion to rescind intervention and ordered that J.T. and G.W. be allowed to participate in the permanency hearing.

The permanency hearing took place on April 29, 2025. C.L.'s CASA, who testified first, stated that his involvement in the case began in September 2023, and he has observed C.L. make significant progress while in the care of the foster family. The CASA related that C.L. could not hold a pencil and had motor skill issues when he was first placed in DCFS custody, but he has since graduated from occupational therapy, speech therapy, and Applied Behavior Analysis therapy. Similarly, C.L. has moved from a self-contained special education class to being fully immersed in a regular class. According to the CASA, C.L. is now in the gifted program. The CASA attributed these accomplishments to C.L.'s foster parents. The CASA also stated that C.L. understands that one of his foster siblings is biologically related to him, and he has a positive relationship with his biological siblings

5

and foster siblings. The CASA testified that he discovered that K.W.'s desire to have C.L. placed in J.T.'s guardianship was due to her plan to move to New Jersey. The CASA reiterated that he had the opportunity to interact with K.W., J.T., and the adult children of K.W. and S.L. Following these interactions and after having observed C.L. in his foster family environment, the CASA urged that the best place for C.L. was with the foster family.

The permanency hearing continued on May 9, 2025. C.L.'s teacher testified that she became aware that he was in foster care in August 2024 prior to the beginning of school at a parent/teacher meet-and-greet day. She indicated that C.L. scored extremely high on his benchmark testing at the beginning and end of the school year, with his end-of-year results placing him at the top of the class (with one other student). C.L.'s teacher expressed her belief that C.L. was thriving due to the educational reinforcements he received from his foster parents. She also stated that C.L. is an extremely gifted writer and is in gifted programs for writing. In prompts given to her students that ask what they are thankful for, unlike other kids, C.L. writes that he is thankful that he is living, has a safe home, and has food that keeps him living. She compared this to other kids in her class who write that they are thankful for more trivial things. The teacher also testified that C.L. is a kind child and was voted by his classmates to receive an award. According to the teacher, C.L. refers to his foster parents as "mom" and "dad," and he refers to K.W. by her first name and adds "my biological mother." The teacher stated that C.L. has never mentioned J.T. during their interactions.

The foster father, C.R., testified next. He discussed C.L. and his routine within the foster family unit. C.R. also informed the court that he

and his wife have a relationship with C.L.'s biological maternal grandmother and that prior to C.L.'s original placement with the family, the grandmother brought C.L. to C.R.'s house for a visit to meet C.L.'s half-sister, whom C.R. and his wife have adopted. C.R. stated that when he was made aware of J.T. and her desire to have visitation with C.L., he eventually got J.T.'s contact information from the maternal grandmother in order to eliminate the "back and forth" and to facilitate visits with J.T. C.R. also testified that when C.L. met J.T. at McDonald's it seemed as if C.L. were meeting J.T. for the first time. C.R. reiterated that he and his wife did their best to accommodate phone calls and visitation between C.L. and J.T. The other children in the home, including C.R.'s biological child, refer to J.T. as aunt because they do not want to put the children in a position where they feel they have to differentiate between families.

C.R. explained he and his wife have always wanted what is in C.L.'s best interest, and he feels like the environment they provide is what is best for C.L. C.R. also described the wellness check that resulted from a complaint J.T. made. Officers showed up at C.R.'s house, and his daughter saw the officers at the front door. C.R. explained that he felt that his daughter related seeing the police officers to the previous instance when C.L. was removed from the foster home and placed back with K.W. C.R. testified that the wellness check disrupted their home environment, and he explained that he understood, following J.T.'s previous behavior with many phone calls and complaints about visits and communication, why this wellness check would be reason to limit communication between C.L. and J.T.

C.R. testified that he did not think trying to create a barrier between the family and J.T., following all of her complaints, would be unreasonable. Despite a complaint made by J.T. about C.L.'s last name being listed incorrectly in the system at C.R.'s church, C.R. explained that C.L. knows his last name and explained that the church simply associated C.L. with the foster family in the system. When J.T. complained about the last name being incorrect in the system, C.R. testified that they requested that the church change C.L.'s last name to his legal last name. C.R. stated that he and his wife are in a position in which they can facilitate connections with both sides of C.L.'s family, meaning he has relationships with people on K.W.'s side and with people on S.L.'s side. C.R. testified that two of C.L.'s half-siblings were adopted by C.R.'s mother-in-law, and the siblings stay in regular contact.

Next to testify at the hearing was Cassandra Braggs, the Child Welfare Specialist for DCFS and C.L.'s case worker. Ms. Braggs testified that the initial case plan was reunification, and she was able to meet with K.W. at the beginning. However, K.W. ultimately communicated that she was no longer interested in working on her case plan and that she wanted C.L. to live with her sister, J.T. Depending on J.T.'s ICPC home study, a plan was in place to have C.L. go to New Jersey with J.T. for a trial placement. Ms. Braggs indicated that due to some of the results, DCFS felt that it was in C.L.'s best interest to stay with the foster placement in Louisiana. Ms. Braggs discussed a previous criminal conviction listed for G.W. and that both J.T. and G.W. had been through drug court. She also stated that G.W.'s children had previously been removed from his care for a short while. Ms. Braggs noted that her interactions with J.T. and G.W. were

8

not always professional or cordial, and on several occasions, G.W. got angry, cursed, and had outbursts. She opined that G.W. seemed as if he would not have the patience to deal with an autistic child like C.L.

On May 23, 2025, K.W. and J.T. testified at the permanency hearing.[4] K.W. stated that she and C.L. visited New Jersey every summer. When C.L. first entered DCFS care, K.W. explained that she did not inform the agency about J.T. because they were "on the outs," but she attributed this to their mother, whom K.W. accused of "working the sisters against each other." K.W. testified that she and J.T. reconciled prior to her getting C.L. back, and J.T. became her support system. K.W. claimed that the foster family does not show C.L. love but instead places him in a room with an iPad to play with. K.W. also stated that C.L. is picked on, and the foster family does not feed him properly, and C.L. told her that his foster father was mean to him. The trial court questioned K.W. as to why she never mentioned J.T. in instances prior to C.L.'s second placement with the foster family. According to K.W., she had been cut off from her family at that time, but realized that she wanted C.L. to be in her family, so she and J.T. decided to reconnect and work together to make that happen.

J.T. testified that she has known C.L. since he was a baby. When she found out that C.L. entered foster care for the second time, she reached out to DCFS and began having contact with him while he was with his foster family. J.T. stated that she has two children in her primary home, a 15-year-old stepdaughter and an 8-year-old daughter. J.T. also testified that two of

---

[4] Throughout the hearing, the trial court had to reprimand K.W. due to different outbursts, inappropriate comments, and body movements. K.W. used profanity during the proceedings, and the court threatened to hold her in contempt. K.W. also walked out of the hearing on multiple occasions, and she left the courtroom during the court's oral reasons for judgment.

her husband's other children live with them 50% of the time. She noted that she and her husband had completed a home study and were approved by the New Jersey Department of Children and Families as a resource family home. J.T. stated that she has been sober from drugs for ten years and is now a better person for continuing her sobriety. She has healthy children, a great relationship with her husband, and a way of helping others achieve sobriety. She also works as a manager at Marcos and generates income as a TikTok influencer. When asked about her children's performance in school, J.T. testified that all of her children do well in school, and they have received special awards and are in gifted or accelerated programs. J.T. stated that New Jersey has an amazing school system that works with children who have special needs.

Related to visitation and phone calls with C.L., J.T. pointed out that C.L. ran to meet her at the McDonald's visit that occurred after C.L. had entered DCFS custody. She stated that C.L. was playing on the playgrounds, saw her, and ran to hug her. J.T. alleged that her husband took pictures of the moment. According to J.T., despite only having two in-person visits with C.L., she sought more, but that all of her requests had been denied by DCFS. She indicated that before DCFS got involved, she and C.L. would have FaceTime and phone calls three to five times a week. However, those calls only occurred twice a month when DCFS became involved. J.T. claimed that there were many occasions when A.R., C.L.'s foster mother, would disconnect the phone calls between J.T. and C.L. From J.T.'s perspective, C.L. enjoyed their phone visits, and J.T. tried to incorporate an activity for them to do to keep his attention while on the phone. J.T. stated that in general, communication between herself and the

foster family went well until she became approved as a resource family in New Jersey. Ultimately, J.T. testified that she believed that she would no longer have contact with C.L. if he were to be permanently placed with the foster family given the strain in the relationship that had occurred in the previous four months.

On July 25, 2025, the trial court gave extremely detailed oral reasons for judgment. In its ruling, the court first noted that C.L. was placed in a foster family which had custody of his biological half-sister, also recognizing that he is in regular contact with two of his other siblings who were adopted by a relative of the foster parents. The court also pointed out that C.L. has a positive relationship with his maternal grandmother and is in contact with his siblings on his father's side. The trial court found that C.L. has made significant physical and social improvements since he has been in his foster family's care. The court specifically found K.W.'s testimony to be lacking credibility. The court further determined that the majority of visits requested by J.T. were on or during holidays, and it did not appear to the court that those requests for visits were arbitrarily denied due to the foster parents' work and travel schedule or plans. The court likewise found J.T.'s testimony to be conflicting and not credible. The court also stated that it believed K.W. to be a danger to C.L. In its reasons, the trial court noted that during an in-chambers conference with C.L., the child indicated his uncertainty about where he would like to live, but the court found this to be understandable given C.L.'s young age.

Ultimately, the court found, "DCFS determined that [J.T. and G.W.'s] home was not a suitable and approved placement for [C.L.], and the Court agrees. [C.L.] is currently placed in a home that is stable, loving, and safe

11

with a biological sibling.  Courts favor placing siblings who have been removed from their home in the same foster care or adoptive placement." The trial court concluded that reasonable efforts were made to reunify K.W. and C.L., and it agreed with the State's and the CASA's recommendation that it is in C.L.'s best interest to remain in the State's custody, for the goal to be changed to adoption, and for C.L. to remain in his current placement with his foster family.  The court also denied K.W.'s motion for guardianship, but it included in its ruling that C.L. and J.T. have phone calls or FaceTime calls occurring at least twice a month on a date and time convenient for the foster family, with the understanding that C.L. can end a call at any time.  Following the trial court's judgment, K.W. filed the instant appeal.

**DISCUSSION**

In her brief, K.W. has asserted three assignments of error.  She first contends that the trial court committed manifest error in concluding that the State presented clear and convincing evidence that changing the goal from reunification to adoption was in the best interest of C.L.  Next, she urges that the trial court manifestly erred in finding that guardianship was not in the best interest of the child.  Finally, K.W. argues that the court committed manifest error in finding that she did not establish by clear and convincing evidence that it was in C.L.'s best interest to be placed in a relative guardianship with his aunt and uncle.

Although K.W. admits that reunification between herself and C.L. is not a viable option, she argues that adoption is not favored because it would require the termination of her parental rights.  K.W. also points out that Louisiana law supports placement with a relative when safe and appropriate

12

as this reflects the importance of familial continuity so long as such placement aligns with the child's best interest. K.W. emphasizes that her sister and brother-in-law, J.T. and G.W., have been approved by New Jersey as a placement for C.L., and they have sufficient financial resources to provide for C.L.'s needs. K.W. also argues that the foster family and DCFS have obstructed/limited visitation between C.L. and J.T. K.W. urges that there is no testimony to support the trial court's conclusion that communication or visits between C.L. and J.T. negatively affected or caused problems for C.L. Instead, the evidence shows that C.L. wanted to maintain contact with J.T. Consequently, there is no evidence suggesting that adoption is in the best interest of C.L.

The State first asserts that the trial court did not err by changing the goal from reunification to adoption since K.W. has made no significant, measurable progress towards achieving the case plan goals. The State contends that DCFS has fulfilled its obligation to make reasonable efforts toward reunification by offering appropriate services and creating an achievable case plan. Due to K.W.'s refusal to take steps towards rehabilitation, the State suggests that reunification will not and cannot occur within a reasonable time, if ever. Therefore, C.L. has a right to permanency that should not be held hostage by K.W.'s refusal to work on the case plan. The State urges that adoption offers superior legal permanency and emotional security for C.L. The State also maintains that the trial court properly denied the motion for guardianship. According to the State, granting guardianship to J.T. would violate the statutory hierarchy, disrupt critical sibling bonds, and undermine the child's right to permanence and stability.

*Assignment of Error No. 1*:

The health, safety, and best interest of the child is the paramount concern in all CINC proceedings. La. Ch. C. art. 601. A CINC proceeding is commenced by a petition filed by the district attorney. When authorized by the court, DCFS may file a petition if there are reasonable grounds to believe that the child is a CINC. La. Ch. C. art. 631; *State in Int. of S.S.*, 55,933 (La. App. 2 Cir. 8/28/24), 401 So. 3d 784; *State in Int. of Z.P.*, 52,354 (La. App. 2 Cir. 9/26/18), 255 So. 3d 727.

Within 60 days after a child enters the custody of a child care agency, the custodian shall develop a case plan detailing the custodian's efforts toward achieving a permanent placement for the child. La. Ch. C. art. 673. The case plan shall be designed to achieve the least restrictive, most family-like, and most appropriate setting available, and in close proximity to the parents' homes, consistent with the best interest and special needs of the child. The health and safety of the child shall be the paramount concern in the development of the case plan. La. Ch. C. art. 675. If, at any point in CINC proceedings, the child is removed from his parents' care and control and placed in the custody of the DCFS, the case review process of La. Ch. C. arts. 687-700 is implemented.

Regarding permanency hearings, La. Ch. C. art. 702 provides, in pertinent part, with emphasis added:

. . . .

B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is

14

permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.

C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:

>   (1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. **In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care**.

>   (2) Adoption.
. . . .

E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.

. . . .

G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child will be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court will advise the parent of his authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.

More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of S.M.*, 98-0922 (La. 10/20/98), 719 So. 2d 445; *State in Int. of S.S.*, *supra*;

*State in Int. of Z.P.*, *supra*. A child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. *State in Int. of S.S.*, *supra*; *State in Int. of Z.P.*, *supra*; *State in Int. of P.B.*, 49,668 (La. App. 2 Cir. 12/17/14), 154 So. 3d 806. Children need permanency and stability, and forcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child. *State in Int. of S.S.*, *supra*; *State in Int. of J.M.L.*, 47,201 (La. App. 2 Cir. 4/11/12), 92 So. 3d 447. While the interest of a parent is protected in a termination proceeding by enforcing the procedural rules enacted to ensure that parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount best interest of the children. *State in Int. of S.S.*, *supra*; *State in Int. of C.S.*, 49,955 (La. App. 2 Cir. 3/18/15), 163 So. 3d 193.

For reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch. C. art. 702(C)(1).

In the context of both the termination of parental rights and the evaluation of permanency plans, the courts have used a reformation test to determine whether a plan of reunification is consistent with the best interest and special needs of a child. This test evaluates whether there is an expectation of reformation of a parent's conduct. A reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although not all of the problems that

16

exist have been eliminated. *State in Int. of S.S.*, *supra*; *State in Int. of Z.P.*, *supra*; *State in Int. of P.B.*, *supra*.

Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated. *Id*.

One of the grounds for termination of parental rights includes that at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and, despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home. La. Ch. C. art. 1015(5). According to La. Ch. C. art. 1036(D), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future under Article 1015(5) may be evidenced by one of more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of S.S.*, *supra*; *State in Int. of C.S.*, *supra*. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *State in Int. of S.S.*, *supra*; *State in Int. of P.F.*, 50,931 (La. App. 2 Cir. 6/22/16), 197 So. 3d 745; *State in Int. of N.C.*, 50,446 (La. App. 2 Cir. 11/18/15), 184 So. 3d 760.

K.W.'s case plan goals included the following actions: completing a substance abuse assessment and following any treatment recommendations from the provider; submitting to random drug screens; completing a mental health assessment and following provider recommendations; maintaining housing that is structurally sound with all utilities in working order; keeping the agency aware of her whereabouts; ensuring the child's safety and well-being; and, remaining actively involved with the child's medical appointments, therapy, and school attendance/involvement.

Throughout the record, DCFS and C.L.'s CASA documented that K.W. consistently failed to make significant measurable progress toward achieving the case plan goals and correcting the conditions which required C.L. to be designated as a CINC. Specifically, K.W. failed to maintain appropriate housing throughout C.L.'s time in foster care, including during

18

the permanency hearing where she indicated that, at that time, she had no stable housing but would have housing soon. Similarly, she failed to comply with the requirement that she abstain from drug use as evidenced by her failure of several drug screens from the time she agreed to work her case plan. On several occasions, K.W. did not attend scheduled family visits, and she consistently missed substance abuse treatment sessions. Most notably, K.W. admitted to DCFS that she no longer had a desire to work on the case plan or to reunify with C.L. Over the course of C.L.'s designation as a CINC, K.W. has shown no reasonable expectation of reformation as demonstrated by her failure to cooperate with state officials and little to no improvement in her behavior. This is further reflected by her poor conduct throughout the permanency hearing proceedings.

We find significant in this matter that C.L. is on the autism spectrum and, as indicated by the testimony and noted by the trial court in its reasons for judgment, he has thrived since being placed with his foster family. Despite having never been in a classroom setting and being unable to independently put his shoes and clothes on prior to entering foster care in 2023, C.L. has now moved to a regular classroom, is in gifted and talented classes, and has scored the highest grade on the end of the year test in his class. We agree with the trial court's assessment that this progress is due to the stability and positive reinforcement C.L. receives from his foster parents. Furthermore, C.L.'s biological sister was adopted by his foster parents, and he maintains regular contact with two other biological siblings who were adopted by extended family of the foster parents. The foster family maintains a relationship with C.L.'s maternal grandmother, and both parties make visits and remain in contact with one another. The record clearly

establishes that C.L. is a child who needs permanency and stability, and the evidence supports that the foster family provides him with both. We agree with the trial court's assessment that changing the case plan's goal from reunification to adoption by C.L.'s current foster family is in his best interest. Having found that the trial court's ruling is not clearly wrong or manifestly erroneous, we find no merit to K.W.'s first assignment of error.

*Assignments of Error Nos. 2 and 3*:

The purpose of guardianship is to provide a permanent placement for children ***when neither reunification with a parent nor adoption has been found to be in their best interest***; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. C. art. 718(A); *State in Int. of K.W.*, 54,304 (La. App. 2 Cir. 1/12/22), 332 So. 3d 825.

La. Ch. C. art. 702 requires a court to determine a permanent plan for a child that is the most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption, respectively, with the health and safety of the child being the paramount concern in its determination of the permanent plan. A mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

(1) The child has been adjudicated to be in need of care.

**(2) Neither adoption nor reunification with a parent is in the best interest of the child.**

20

>(3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.
>
>(4) The proposed guardian is able to provide a safe, stable, and wholesome home for the child for the duration of minority.
>
>. . . .
>
>La. Ch. C. art. 722(A). (Emphasis added.)

To reverse a trial court's permanency plan determination, an appellate court must find from the record that the trial court's finding is clearly wrong or manifestly erroneous. *State in Int. of S.S.*, *supra*; *State in Int. of K.W.*, *supra*; *State in Int. of C.S.*, *supra*.

Louisiana law clearly dictates that the purpose of guardianship is to provide a permanent placement for children when ***neither reunification with a parent nor adoption*** has been found to be in their best interest. La. Ch. C. art. 718(A). We have agreed with the trial court that adoption is in C.L.'s best interest, and our reasons for affirming the trial court's judgment are expressed above.

Nonetheless, we note that the trial court articulated specific reasons in support of its determination that an award of guardianship over C.L. to J.T. and G.W. was not in C.L.'s best interest and that K.W. failed to show by clear and convincing evidence that J.T. and G.W. were not a viable, permanent placement option for C.L. Although C.L. was adjudicated as a CINC, K.W. failed to prove the remaining requirements of La. Ch. C. art. 722(A). The trial court found more credible the testimony that indicated that C.L. had little to no prior existing relationship with J.T. The court opined that had J.T. had the relationship with C.L. that she testified about, the court believed that J.T. would have been trying to track C.L. down during the

21

seven months C.L. spent with the foster family from July 2023 to February 2024.  However, no such effort was made by J.T. during that time.

The trial court also expressed its doubts in J.T. and G.W.'s ability to provide a safe, stable, and wholesome home for C.L.  The trial court took note of J.T.'s poor treatment of the DCFS case worker when J.T. and the case worker discussed the alleged communication issues between J.T. and the foster family.  The court also highlighted discrepancies in J.T.'s testimony about her income and her housing situation in New Jersey.  There were also discrepancies in G.W.'s testimony during his questioning regarding his drug use and allegations of his having placed his children at risk of harm.  The court noted that G.W. became angry with the line of questioning, claimed that the risk of harm allegations were not true, and scolded the attorney for asking those questions.  The trial court expressed that it also found noteworthy that J.T. would often need to have questions repeated, would not directly answer questions, and had conflicting testimony when questioned by the State.  However, this was not the case when J.T. was being questioned by her own attorney.  Based on the testimony given by J.T. and G.W. and upon information contained in the ICPC letter, the trial court agreed with DCFS that J.T. and G.W. were not a suitable and approved placement for C.L.[5]  Nothing in the record suggests otherwise.  Consequently, we find that K.W. failed to show by clear and convincing evidence that J.T. and G.W. were candidates to be C.L.'s guardians.  These assignments of error have no merit.

---

[5] Despite this finding by the trial court, it provided in its permanency judgment that C.L. and J.T. remain in contact with visitation via phone calls or FaceTime calls at least twice a month at a date and time that is convenient for the foster family.  We believe this addresses C.L.'s attorney's arguments made in brief that C.L. remain in communication with J.T. to foster a relationship with that part of his family.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's decision approving the change in the case plan's permanent goal from reunification to adoption and denying K.W.'s motion for guardianship.

**AFFIRMED**.